# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOYD MILLIKEN, derivatively on behalf of SYMANTEC CORP., | |
| Plaintiff, | **C.A. No. _____** |
| v. | |
| GREGORY S. CLARK, NICHOLAS R. NOVIELLO, MARK S. GARFIELD, FRANK E. DANGEARD, KENNETH Y. HAO, DAVID HUMPHREY, GERALDINE B. LAYBOURNE, DAVID L. MAHONEY, ROBERT S. MILLER, ANITA M. SANDS, DANIEL H. SCHULMAN, V. PAUL UNRUH, and SUZANNE M. VAUTRINOT, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| SYMANTEC CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Boyd Milliken ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Symantec Corporation ("Symantec" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Gregory S. Clark,

1

Nicholas R. Noviello, Mark S. Garfield, Frank E. Dangeard, Kenneth Y. Hao, David W. Humphrey, Geraldine B. Laybourne, David L. Mahoney, Robert S. Miller, Anita M. Sands, Daniel H. Schulman, V. Paul Unruh, and Suzanne M. Vautrinot (collectively, the "Individual Defendants," and together with Symantec, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Symantec, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Symantec, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Symantec's directors and officers from May 10, 2017 through the present (the "Relevant Period").

2.      Symantec provides cybersecurity services for consumers and enterprises.

3.      In August 2016 and February 2017, respectively, Symantec completed acquisitions of Blue Coat, Inc. ("Blue Coat") and LifeLock, Inc. ("LifeLock"), which the Company promoted during the Relevant Period as being "transformative" and the future of the Company.

4.     Also during the Relevant Period, Symantec disseminated financial statements containing false and misleading non-GAAP[1] financial figures to portray the purported success of the Company and its Blue Coat and LifeLock acquisitions.

5.     In determining annual incentives for executive compensation, the Company also relied on such false and misleading non-GAAP financial figures.

6.     On May 10, 2018, after markets closed, the Company issued a press release announcing its financial results for its fiscal year and quarter ended March 31, 2018. The press release announced that an internal investigation by the Audit Committee had been initiated based on concerns raised by a former employee, and that the SEC had already been informed of the investigation. It further revealed that its financial results and guidance were subject to change based on the outcome of the investigation, and that the Company was unlikely to be able to timely file its annual report on Form 10-K with the SEC.

7.     On this news, the Company's share price dropped over 33%, or $9.66, from a closing price of $29.18 per share on May 10, 2018 to close at $19.52 per share on May 11, 2018.

8.     On May 14, 2018, the Company issued another press release regarding the investigation, revealing that the concerns raised by the former employee related to "the Company's public disclosures including commentary on historical financial results, its reporting of certain Non-GAAP measures including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation."

9.     The Company held a conference call with analysts and investors on May 14, 2018 after issuing the press release. During the call, Defendant Greg Clark repeatedly refused to answer questions regarding the Audit Committee investigation.

---

[1] "GAAP" stands for U.S. Generally Accepted Accounting Principles.

10.     On May 15, 2018, *Probes Reporter* published an article authored by John P. Gavin titled "Investors Are Right To Worry About Symantec: It Appears The SEC Has Been Investigating Since At Least April." The article noted that "research suggests the SEC was already investigating Symantec as early as [April 17, 2018]."

11.     On May 17, 2018, *MarketWatch* published an article authored by Francine McKenna, titled "Companies including Symantec are using 'ghost revenue' to calculate bonuses," which asserted, *inter alia*, that the Company added back millions in deferred revenue to calculate bonuses.

12.     On September 24, 2018, the Company issued a press release announcing the completion of the Audit Committee's investigation and its findings, including "relatively weak and informal process with respect to some aspects of the review, approval and tracking of transition and transformation expenses," and that the Company improperly recognized $12 million as revenue from a transaction when it should instead have been deferred. The press release moreover disclosed that the SEC commenced a formal investigation of Symantec.

13.     In breach of their fiduciary duties, the Individual Defendants caused Symantec to manipulate its financial results and accounting to pay certain of its employees excessive and unwarranted compensation (the "Compensation Misconduct").

14.     Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

15.     Also during the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, prospects, and legal compliance. Specifically, the Individual Defendants willfully or recklessly

4

made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company improperly recognized revenue in violation of GAAP and SEC regulations, including by accelerating the recognition of deferred revenue that had not met GAAP revenue recognition criteria, and thus overstated its adjusted revenue and adjusted operating income; (2) the Company was not in compliance with its own policy on internal revenue recognition; (3) the Company utilized a "Restructuring, separation, transition and other" adjustment to entirely remove Symantec's "transition costs" from its adjusted operating expenses, despite that this line item consisted of recurring and continuing operating expenses incurred in the ordinary course of business, and thus this line item and the Company's transition costs were misstated; (4) the Company's operating margin, earnings per share, and adjusted operating income figures, which were derived using the above misleading metrics, were also misstated; (5) as a result of the Company's use of certain non-GAAP measures, the Company would be subject to an investigation by the SEC; (6) the Company retaliated against employees; (7) the Compensation Misconduct was occurring; (8) the Company was manipulating financial metrics to falsely indicate that the Company and its strongly-promoted Blue Coat and LifeLock acquisitions were successful; and (9) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact to the investing public.

17.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while four of them engaged in insider sales,

netting proceeds of over $19 million. Approximately 2.2 million shares of the Company's common stock were repurchased between April 29, 2016 and May 26, 2017 for approximately $67.1 million.[2] As the Company stock was actually only worth $19.52 per share, the price at which it was trading on May 11, 2018, the Company overpaid approximately $24.2 million in total.

18.     In light of the Individual Defendants' misconduct, which has subjected Symantec, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Chief Accounting Officer ("CAO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and of one of them in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Symantec Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

---

[2] Upon information and belief, some, if not all, of these shares were repurchased subsequent to the beginning of the Relevant Period on May 20, 2017.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

21.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District because the Company is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of Symantec common stock. Plaintiff has continuously held Symantec common stock at all relevant times.

### Nominal Defendant Symantec

26.     Symantec is a Delaware corporation with its principal executive offices at 350 Ellis Street, Mountain View, CA 94043. Symantec's shares trade on the NASDAQ under the ticker symbol "SYMC."

### Defendant Clark

27.     Defendant Gregory S. Clark ("Clark") has served as the Company's CEO and a member of the Board since August 2016. According to the Company's Schedule 14A filed with the SEC on August 16, 2017 (the "2017 Proxy Statement), as of June 30, 2017, Defendant Clark beneficially owned 4,593,111 shares of the Company's common stock.[3] Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Clark owned approximately $129.8 million worth of Symantec stock.

28.     For the fiscal year ended March 31, 2017, Defendant Clark received $6,059,752 in compensation from the Company. This included $666,667 in salary,[4] $4,269,815 in stock awards, $743,333 in non-equity incentive plan compensation, and $379,937 in all other compensation.

29.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Clark made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| August 28, 2017 | 186,433 | $   30.00 | $   5,592,990 |
| August 31, 2017 | 13,567 | $   30.00 | $      407,010 |

Thus, in total, before the fraud was exposed, he sold 200,000 Company shares on inside information, for which he received approximately $6 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

30.     The Company's 2017 Proxy Statement stated the following about Defendant Clark:

---

[3] This figure includes 207,907 shares held by the T.R. 01/29/2016 Gregory S. Clark Living Trust for which Defendant Clark exercises voting and dispositive power, 2,121,613 shares held by GSC-OZ Investment LLC for which Defendant Clark exercises voting and dispositive power, 1,932,635 shares subject to options that will be exercisable as of August 29, 2017 and 123,644 shares issuable upon the settlement of RSUs as of August 29, 2017.
[4] Represents the base salary earned by Defendant Clark since the closing of the acquisition of Blue Coat in August 2016. The fiscal 2017 annual base salary for Defendant Clark was $1,000,000.

*Mr. Clark*[5] has served as our Chief Executive Officer and a member of our Board since August 2016. Prior to joining Symantec, he served as the Chief Executive Officer of Blue Coat and as a member of Blue Coat's board of directors from September 2011 to August 2016, when we acquired that company. From 2008 to August 2011, Mr. Clark was the President and Chief Executive Officer of Mincom, a global software and service provider to asset-intensive industries. Before joining Mincom, he was a Founder and served as President and Chief Executive Officer of E2open, a provider of cloud-based supply chain software, from 2001 until 2008. Earlier in his career, Mr. Clark founded a security software firm, Dascom, which was acquired by IBM in 1999. He served as a distinguished engineer and Vice President of IBM's Tivoli Systems, a division providing security and management products, from 1999 until 2001. Mr. Clark holds a Bachelor's degree from Griffith University.

**Defendant Noviello**

31.     Defendant Nicholas R. Noviello ("Noviello") has served as the Company's Executive Vice President and CFO since December 2016, and as its Principal Accounting Officer since August 2017. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Noviello beneficially owned 968,062 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Noviello owned over $27.3 million worth of Symantec stock.

32.     For the fiscal year ended March 31, 2017, Defendant Noviello received $2,163,663 in compensation from the Company. This included $433,333 in salary,[7] $1,077,917 in stock awards, $479,673 in non-equity incentive plan compensation, and $172,740 in all other compensation.

---

[5] Emphasis in original unless otherwise noted throughout.

[6] Includes 926,314 shares subject to options that will be exercisable as of August 29, 2017 and 31,214 shares issuable upon the settlement of RSUs as of August 29, 2017.

[7] Represents the base salary earned by Defendant Noviello since the closing of the acquisition of Blue Coat in August 2016. The fiscal 2017 annual base salary for Defendant Noviello was $650,000.

33.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Noviello made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| August 28, 2017 | 14,925 | $   30.00 | $     447,750 |
| September 7, 2017 | 7,688 | $   30.00 | $     230,640 |
| November 6, 2017 | 375,000 | $   29.38 | $   11,018,250 |

Thus, in total, before the fraud was exposed, he sold 397,613 Company shares on inside information, for which he received approximately $11.7 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

34.     The Company's 2017 Proxy Statement stated the following about Defendant Noviello:

> *Mr. Noviello* has served as our Executive Vice President and Chief Financial Officer since December 2016. Prior to that, he served as our Executive Vice President and Chief Integration Officer from August 2016 to November 2016. Prior to joining Symantec, Mr. Noviello served as Blue Coat's Chief Financial Officer from January 2016 to August 2016, when we acquired that company. Prior to joining Blue Coat, he served as Executive Vice President, Finance and Operations, and Chief Financial Officer for NetApp, a publically [sic] traded global data management and storage company, from January 2012 through January 2016. From January 2008 until January 2012, Mr. Noviello held a variety of positions of increasing seniority within the finance organization at NetApp, including Controller and Global Controller. Prior to joining NetApp, he spent eight years at Honeywell International, where he was Chief Financial Officer of two global business units, ran investor relations, and was a leader on the corporate mergers and acquisitions team. Mr. Noviello started his career at PricewaterhouseCoopers. He is a Certified Public Accountant and holds a Bachelor's degree in business administration from Boston University and a Master's degree in taxation from Fairleigh Dickinson University.

**Defendant Garfield**

35.     Defendant Mark S. Garfield ("Garfield") served as the Company's CAO from February 3, 2014 to August 7, 2017, and provided services to the Company in an advisory capacity through October 2017.

**Defendant Dangeard**

36.     Defendant Frank E. Dangeard ("Dangeard") has served on the Company's Board since 2007 and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Dangeard beneficially owned 95,426 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Dangeard owned approximately $2.7 million worth of Symantec stock.

37.     For the fiscal year ended March 31, 2017, Defendant Dangeard received $360,013 in compensation from the Company, comprised of $85,013 in fees earned or paid in cash, and $275,000 in stock awards.

38.     The Company's 2017 Proxy Statement stated the following about Defendant Dangeard:

> *Mr. Dangeard* has served as a member of our Board since January 2007. He has been the Managing Partner of Harcourt, an advisory firm, since March 2008. Mr. Dangeard was Chairman and Chief Executive Officer of Thomson, a provider of digital video technologies, solutions and services, from September 2004 to February 2008. From September 2002 to September 2004, he was Deputy Chief Executive Officer of France Telecom, a global telecommunications operator. From 1997 to 2002, Mr. Dangeard was Senior Executive Vice President of Thomson and served as its Vice Chairman in 2000. Prior to joining Thomson, he was Managing Director of SG Warburg & Co. Ltd. from 1989 to 1997 in London, Paris and Madrid and Chairman of SG Warburg France from 1995 to 1997. Prior to that, Mr. Dangeard was a lawyer with Sullivan & Cromwell, in New York and London. He serves on the boards of RPX Corporation and Royal Bank of Scotland Group PLC ("RBS Group"), and on a number of advisory boards. Mr. Dangeard has previously served as a director of a variety of companies, including Crédit Agricole CIB, Eutelsat, Home Credit, SonaeCom, Thomson, Electricité de France and

Telenor. He graduated from the École des Hautes Études Commerciales, the Paris Institut d'Études Politiques and holds an LLM degree from Harvard Law School.

**Defendant Hao**

39.     Defendant Kenneth Y. Hao ("Hao") has served on the Company's Board of Directors since March 2016. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Hao beneficially owned 29,418 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Hao owned over $831,000 worth of Symantec stock.

40.     For the fiscal year ended March 31, 2017, Defendant Hao received $340,023 in compensation from the Company, comprised of $15,023 in fees earned or paid in cash, and $325,000 in stock awards.

41.     The Company's 2016 Proxy Statement stated the following about Defendant Hao:

*Mr. Hao* has served as a member of our Board since March 2016. Mr. Hao joined Silver Lake Partners in 2000 and currently serves Silver Lake as a Managing Partner and Managing Director. Mr. Hao also serves on the boards of directors of Broadcom Limited and SMART Global Holdings, Inc., as well as on the board of directors of a number of private companies in Silver Lake's portfolio. Prior to joining Silver Lake, he was an investment banker with Hambrecht & Quist, where he served as a Managing Director in the Technology Investment Banking group. He also serves on the Executive Council for UCSF Health. Mr. Hao graduated from Harvard University with a Bachelor's degree in economics.

**Defendant Humphrey**

42.     Defendant David Humphrey ("Humphrey") has served as a Company director since August 2016. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Humphrey beneficially owned 18,630 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Humphrey owned approximately $526,297 worth of Symantec stock.

43.     For the fiscal year ended March 31, 2017, Defendant Humphrey received $230,332 in compensation from the Company, comprised of $46,747 in fees earned or paid in cash, and $183,585 in stock awards.

44.     The Company's 2017 Proxy Statement stated the following about Defendant Humphrey:

> *Mr. Humphrey* has served as a member of our Board since August 2016 when he joined in connection with Bain Capital's investment in Symantec, prior to which he served on Blue Coat's board of directors since May 2015. He is a Managing Director of Bain Capital, a private equity firm, where he co-leads the firm's investing efforts in technology, media and telecom investments and where he has worked since 2001. Prior to joining Bain Capital, Mr. Humphrey was an investment banker in the mergers and acquisitions group at Lehman Brothers from 1999 to 2001. He serves on the boards of directors of BMC Software and Genpact Ltd. and on the board of directors of a number of private companies in Bain Capital's portfolio. Mr. Humphrey previously served on the boards of directors of Bright Horizons Family Solutions, Inc. Burlington Coat Factory Warehouse Corporation, Skillsoft PLC and Bloomin' Brands, Inc. He received a Master of Business Administration degree from Harvard Business School and a Bachelor's degree from Harvard University.

**Defendant Laybourne**

45.     Defendant Geraldine B. Laybourne ("Laybourne") has served as a Company director since 2008 and is a member of the Compensation Committee. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Laybourne beneficially owned 120,727 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Laybourne owned over $3.4 million worth of Symantec stock.

46.     For the fiscal year ended March 31, 2017, Defendant Laybourne received $340,012 in compensation from the Company, comprised of $65,012 in fees earned or paid in cash, and $275,000 in stock awards.

47.     The Company's 2017 Proxy Statement stated the following about Defendant Laybourne:

> *Ms. Laybourne* has served as a member of our Board since January 2008. She has been the Chairman of the Board of Katapult Studio (formerly Kandu), a children's software company, since May 2013, and was acting Chief Executive Officer from October 2014 to May 2015. Ms. Laybourne was the Chairman of the Board of Defy Media, LLC, a media company, from November 2010 to April 2015. She founded Oxygen Media in 1998 and served as its Chairman and Chief Executive Officer until November 2007, when the network was acquired by NBC Universal. Prior to starting Oxygen Media, Ms. Laybourne spent 16 years at Nickelodeon. From 1996 to 1998, she was President of Disney/ABC Cable Networks where she managed cable programming for the Walt Disney Company and ABC. Ms. Laybourne is also currently a member of the board of directors of four private companies, serves on the Board of Trustees for Vassar College, and is a former member of the board of directors of J.C. Penney, Electronic Arts and Move, Inc. She earned a Bachelor's degree in art history from Vassar College and a Master of Science degree in elementary education from the University of Pennsylvania.

**Defendant Mahoney**

48.     Defendant David L. Mahoney ("Mahoney") has served as a Company director since 2003 and is the chair of the Compensation Committee. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Mahoney beneficially owned 174,979 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Mahoney owned over $4.9 million worth of Symantec stock.

49.     For the fiscal year ended March 31, 2017, Defendant Mahoney received $370,023 in compensation from the Company, comprised of $45,023 in fees earned or paid in cash, and $325,000 in stock awards.

50.     The Company's 2017 Proxy Statement stated the following about Defendant Mahoney:

> *Mr. Mahoney* has served as a member of our Board since April 2003. He previously served as co-Chief Executive Officer of McKesson HBOC, Inc., a healthcare services company, and as Chief Executive Officer of iMcKesson LLC, also a healthcare services company, from July 1999 to February 2001. Mr. Mahoney is a

member of the boards of directors of Adamas Pharmaceuticals, Inc. Corcept Therapeutics Incorporated and two non-profit organizations, a member of the board of trustees of Mount Holyoke College, as well as a trustee of the Schwab/Laudus fund family. He has previously served as a director of a variety of companies, including Tercica Inc. Mr. Mahoney has a Bachelor's degree from Princeton University and a Master of Business Administration degree from Harvard Business School.

**Defendant Miller**

51.     Defendant Robert S. Miller ("Miller") has served as a Company director since 1994 and is a member of the Audit Committee and Compensation Committee. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Miller beneficially owned 135,513 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Miller owned over $3.8 million worth of Symantec stock.

52.     For the fiscal year ended March 31, 2017, Defendant Miller received $380,013 in compensation from the Company, comprised of $105,013 in fees earned or paid in cash, and $275,000 in stock awards.

53.     The Company's 2017 Proxy Statement stated the following about Defendant Miller:

> *Mr. Miller* has served as a member of our Board since September 1994. He is President and Chief Executive Officer of International Automotive Components (IAC) Group, a global supplier of automotive components and systems. Mr. Miller is also the Chairman of the Board of MidOcean Partners, a private equity firm specializing in leveraged buyouts, recapitalizations and growth capital investments in middle-market companies. He served as Chairman of the Board of American International Group (AIG), an insurance and financial services organization, from July 2010 to June 2015. Mr. Miller served as Chief Executive Officer of Hawker Beechcraft, an aircraft manufacturing company, from February 2012 to February 2013. He served as Executive Chairman of Delphi Corporation, an auto parts supplier, from January 2007 until November 2009 and as Chairman and Chief Executive Officer from July 2005 until January 2007. From January 2004 to June 2005, Mr. Miller was non-executive Chairman of Federal Mogul Corporation, an auto parts supplier. From September 2001 until December 2003, he was Chairman and Chief Executive Officer of Bethlehem Steel Corporation, a large steel producer.

15

Prior to joining Bethlehem Steel, Mr. Miller served as Chairman and Chief Executive Officer on an interim basis upon the departure of Federal Mogul's top executive in September 2000. Hawker Beechcraft filed a voluntary petition for reorganization under the United States Bankruptcy Code (USBC) in May 2012. He is also a member of the boards of directors of Dow Chemical and two private companies in addition to IAC Group and MidOcean Partners. In addition to his executive roles, Mr. Miller has previously served as a director of a variety of companies, including AIG, UAL Corporation, WL Ross Holding Corp., Reynolds American, Inc., U.S. Bancorp, and Waste Management, Inc. He earned a degree in economics from Stanford University, a law degree from Harvard Law School and a Master of Business Administration, majoring in finance from Stanford Business School.

**Defendant Sands**

54.     Defendant Anita M. Sands ("Sands") has served as a Company director since 2013 and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Sands beneficially owned 45,386 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Sands owned approximately $1.3 million worth of Symantec stock.

55.     For the fiscal year ended March 31, 2017, Defendant Sands received $345,013 in compensation from the Company, comprised of $70,013 in fees earned or paid in cash, and $275,000 in stock awards.

56.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sands made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| July 12, 2017 | 2,000 | $   30.00 | $   60,000 |
| July 17, 2017 | 2,000 | $   30.40 | $   60,798 |
| August 28, 2017 | 2,000 | $   30.00 | $   60,000 |
| September 18, 2017 | 2,000 | $   33.51 | $   67,016 |

Thus, in total, before the fraud was exposed, she sold 8,000 Company shares on inside information, for which she received approximately $247,814. Her insider sales made with knowledge of

material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

57.     The Company's 2017 Proxy Statement stated the following about Defendant Sands:

*Ms. Sands* has served as a member of our Board since October 2013. She served as Group Managing Director, Head of Change Leadership and a member of the Wealth Management Americas Executive Committee of UBS Financial Services, a global financial services firm, from April 2012 to September 2013. Ms. Sands was Group Managing Director and Chief Operating Officer of Wealth Management Americas at UBS Financial Services from April 2010 to April 2012. Prior to that, she was a Transformation Consultant at UBS Financial Services from October 2009 to April 2010. Prior to joining UBS Financial Services, Ms. Sands was Managing Director, Head of Transformation Management at Citigroup's Global Operations and Technology organization. She also held several leadership positions with RBC Financial Group and CIBC. Ms. Sands is on the boards of directors of ServiceNow, Inc. and Pure Storage, Inc. She received a Bachelor's degree in physics and applied mathematics from The Queen's University of Belfast, Northern Ireland, a Doctorate in atomic and molecular physics from The Queen's University of Belfast, Northern Ireland and a Master of Science degree in public policy and management from Carnegie Mellon University.

**Defendant Schulman**

58.     Defendant Daniel H. Schulman ("Schulman") has served as a Company director since 2000, is Chairman of the Board, and is a member of the Compensation Committee. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Schulman beneficially owned 144,545 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Schulman owned approximately $4.1 million worth of Symantec stock.

59.     For the fiscal year ended March 31, 2017, Defendant Schulman received $455,013 in compensation from the Company, comprised of $180,013 in fees earned or paid in cash, and $275,000 in stock awards.

60.     The Company's 2017 Proxy Statement stated the following about Defendant Schulman:

17

*Mr. Schulman* has served as a member of our Board since March 2000. He has served as President and then Chief Executive Officer of PayPal Holdings, Inc., an online payment system company, since September 2014. Previously, Mr. Schulman served as Group President, Enterprise Group of American Express, a financial services company, from August 2010 to September 2014. He was President, Prepaid Group of Sprint Nextel Corporation, a cellular phone service provider, from November 2009 until August 2010. Mr. Schulman served as Chief Executive Officer of Virgin Mobile USA, a cellular phone service provider, from September 2001 to November 2009, when Sprint Nextel acquired that company. He also served as a member of the board of directors of Virgin Mobile USA from October 2001 to November 2009. Mr. Schulman is a member of the boards of directors of PayPal Holdings, Inc., Flextronics International Ltd. and a non-profit organization. He received a Bachelor's degree in economics from Middlebury College and a Master of Business Administration degree, majoring in Finance, from New York University.

### Defendant Unruh

61.     Defendant V. Paul Unruh ("Unruh") has served as a Company director since 2005 and is the chair of the Audit Committee. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Unruh beneficially owned 75,267 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Unruh owned approximately $2.1 million worth of Symantec stock.

62.     For the fiscal year ended March 31, 2017, Defendant Unruh received $370,013 in compensation from the Company, comprised of $95,013 in fees earned or paid in cash, and $275,000 in stock awards.

63.     The Company's 2017 Proxy Statement stated the following about Defendant Unruh:

*Mr. Unruh* has served as a member of our Board since July 2005 following the acquisition of Veritas. He had served on Veritas' board of directors since 2003. Mr. Unruh retired as Vice Chairman of Bechtel Group, Inc., a global engineering and construction services company, in June 2003. During his 25-year tenure at Bechtel Group, he held a number of management positions including Treasurer, Controller and Chief Financial Officer. Mr. Unruh also served as President of Bechtel Enterprises, the finance, development and ownership arm from 1997 to 2001. He is a member of the board of directors of Aconex Ltd., which is traded on

the Australian Stock Exchange, and a private company. Mr. Unruh is a Certified Public Accountant.

**Defendant Vautrinot**

64.    Defendant Suzanne M. Vautrinot ("Vautrinot") has served as a Company director since 2005 and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of June 30, 2017, Defendant Vautrinot beneficially owned 32,825 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2017 was $28.25, Vautrinot owned approximately $927,306 worth of Symantec stock.

65.    For the fiscal year ended March 31, 2017, Defendant Vautrinot received $370,013 in compensation from the Company, comprised of $95,013 in fees earned or paid in cash, and $275,000 in stock awards.

66.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Vautrinot made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| July 3, 2017 | 2,500 | $    28.45 | $    71,125 |
| October 2, 2017 | 2,500 | $    32.81 | $    82,025 |
| March 9, 2018 | 4,000 | $    27.72 | $  110,880 |

Thus, in total, before the fraud was exposed, she sold 9,000 Company shares on inside information, for which she received approximately $264,030. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

67.    The Company's 2017 Proxy Statement stated the following about Defendant Vautrinot:

*Ms. Vautrinot* has served as a member of our Board since October 2013. She has been President of Kilovolt Consulting Inc., an advisory firm, since October 2013. Ms. Vautrinot retired from the United States Air Force in October 2013 after over 30 years of service. During her career with the United States Air Force, she served in a number of leadership positions including Major General and Commander, 24th Air Force/Network Operations from April 2011 to October 2013; Special Assistant to the Vice Chief of Staff from December 2010 to April 2011; Director of Plans and Policy, U.S. Cyber Command from May 2010 to December 2010 and Deputy Commander, Network Warfare, U.S. Strategic Command, from June 2008 and May 2010. Ms. Vautrinot is a member of the board of directors of Ecolab, Inc., Wells Fargo & Company and a private company. She received a Bachelor of Science degree from the U.S. Air Force Academy, a Master of Systems Management degree from University of Southern California, and completed Air Command and Staff College as well as Air War College. Ms. Vautrinot was a National Security Fellow at the John F. Kennedy School of Government at Harvard University. In 2017 she was inducted into the National Academy of Engineering.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

68.   By reason of their positions as officers, directors, and/or fiduciaries of Symantec and because of their ability to control the business and corporate affairs of Symantec, the Individual Defendants owed Symantec and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Symantec in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Symantec and its shareholders so as to benefit all shareholders equally.

69.   Each director and officer of the Company owes to Symantec and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

70.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Symantec, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

71.     To discharge their duties, the officers and directors of Symantec were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

72.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Symantec, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Symantec's Board at all relevant times.

73.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual

Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

74.     To discharge their duties, the officers and directors of Symantec were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Symantec were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Symantec's own Code of Conduct and Financial Code of Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Symantec conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Symantec and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Symantec's operations would comply with all

applicable laws and Symantec's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

75.     Each of the Individual Defendants further owed to Symantec and the shareholders the duty of loyalty requiring that each favor Symantec's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

76.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Symantec and were at all times acting within the course and scope of such agency.

77.     Because of their advisory, executive, managerial, and directorial positions with Symantec, each of the Individual Defendants had access to adverse, non-public information about the Company.

78.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Symantec.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act.

81.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Symantec, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

82.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

24

83.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Symantec and was at all times acting within the course and scope of such agency.

## SYMANTEC'S CODE OF CONDUCT

84.     The Company's Code of Conduct (the "Code of Conduct"), states that: "***Our Code defines what we expect from all employees.*** It also applies to all non-employee directors and third parties representing Symantec, such as contractors."

85.     The Code of Conduct provides that, among other things, "Every team member must: Comply with the laws, rules, and regulations in each Country where we conduct business."

86.     The Code of Conduct provides, as to "Insider Trading," that:

> Everyone at Symantec is prohibited from providing inside information—about our company or its suppliers, customers, or other third parties—to others. Insider trading, insider dealing, and stock tipping are criminal offenses in most countries where Symantec does business. ***Any employee or director who has material, non-public information about Symantec may not buy or sell Symantec securities or engage in any other action to take advantage of or to pass on to others, that information.*** Those who are likely to have access to inside information are restricted from engaging in any transactions with Symantec securities during quarterly blackout periods, except for trades pursuant to Rule 10b5-1 plans. In addition, certain employees must obtain prior written approval for all securities transactions, regardless of when they occur . . .

(Emphasis added.)

87.     The Code of Conduct provides, as to "Finance and Accounting Practices," that:

> As a publicly traded company, Symantec adheres to strict accounting **PRINCIPLES** and **STANDARDS** of financial reporting. You must accurately and completely record any financial information related to Symantec's revenues and expenses. The Audit Committee is directly responsible for the appointment, compensation, and oversight of the work of the Company's independent auditors and work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents. Violations of laws associated with accounting and financial reporting can damage Symantec's **REPUTATION**, and can also result in fines, penalties, and even imprisonment. You should promptly report to the Chief Financial Officer, General Counsel or the Audit Committee of the Board of Directors any conduct that you believe to be a

violation of law or business ethics or of any provision of this Code, including any transaction or relationship that reasonably could be expected to give rise to such a conflict.

88.     The Code of Conduct provides, as to "How to Raise a Concern," that:

We offer access to a number of different channels to get answers to questions, and to raise any potential concerns. Remember —it is important to voice your good faith concerns through these appropriate channels. This includes any potential violations of our Code, company policies or procedures, and the law. ***If you believe you're being asked to commit or support an illegal or unethical act, we encourage you to speak up promptly.*** When you feel/ think/see/believe/wonder/worry about something you feel may be illegal or unethical—speak up right away! Ignoring a problem makes you part of the problem.

(Emphasis added.)

89.     The Code of Conduct provides, as to "Non-Retaliation," that:

You will never be penalized for speaking up when you report a possible violation of Symantec's policies or for cooperating with an investigation. On the other hand, knowingly making false or malicious reports will not be tolerated, and anyone filing such reports will be subject to appropriate disciplinary action. Each of us needs to do the right thing when it comes to reporting concerns, including suspected violations of the law or company policies and incidents of harassment or discrimination. If you believe you are being retaliated against, contact the Office of Ethics and Compliance immediately.

90.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. Several of the Individual Defendants violated the code by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner,

properly report violations of the Code of Conduct, and ensure that employees reporting violations

of the Code of Conduct are not retaliated against.

## SYMANTEC'S FINANCIAL CODE OF ETHICS

91.     The Company also maintains a Financial Code of Ethics (the "Code of Ethics") that

applies to the Company's CEO, CFO, "and other members of the Symantec Finance Department."

92.     The Code of Ethics provides that "Symantec Corporation is dedicated to ensuring

compliance with the highest standards of financial accounting and reporting and has the highest

confidence in its financial reporting, underlying systems of internal controls and its financial

employees. Our financial employees operate under the highest level of ethical standards."

93.     The Code of Ethics requires adherence to the following relevant practices:

1. Act with honesty and integrity and use due care and diligence in performing
one's responsibilities to the Company, and avoid situations that represent actual or
apparent conflicts of interest with one's responsibilities to Company.
3.[8] Communicate information in a manner that ensures full, fair, accurate, timely
and understandable disclosure in reports and documents that Symantec files with,
or submits to, government agencies and in other public communications.
4. Comply with applicable laws, rules and regulations of federal, state, provincial
and local governments, and other appropriate private and public regulatory
agencies.
5. Respect and safeguard the confidentiality of information acquired in the course
of one's work except when authorized or legally obligated to disclose such
information, and, in any event, not use confidential information for personal
advantage.

* * *

7. Proactively promote and be an example of ethical behavior as a responsible
partner among peers, in the work environment and the community.

* * *

9. Promptly report to the Chief Financial Officer, General Counsel or the Audit
Committee of the Board of Directors any conduct that the individual believes to be
a violation of law or business ethics or of any provision of this Financial Code of

---

[8] Numbering reproduced as in original.

Ethics, including any transaction or relationship that reasonably could be expected to give rise to such a conflict.

94.     In violation of the Code of Ethics, the Defendants Clark and Noviello conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. Defendants Clark and Noviello violated the Code of Ethics by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Ethics, Defendants Clark and Noviello failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT[9]

### Background

95.     Founded in 1982, Symantec describes itself as a "global leader in cybersecurity," providing security services for consumers and enterprises.  Symantec's Enterprise Security segment has the greatest impact on the Company's revenues, and arrangements in that segment consist of multiple elements, including hardware, perpetual software licenses, term-based software license subscriptions, maintenance, and services.

96.     Symantec acquired Blue Coat and LifeLock, Inc. during the fiscal year ended March 31, 2017.  After completing the acquisition of Blue Coat, Symantec appointed several former Blue Coat executives to senior executive roles within the Company. For example, the

---

[9]  Allegations contained herein concerning the Company's accounting violations and the Compensation Misconduct are corroborated by former Symantec employees who provided information in the Securities Class Action.

Company appointed Blue Coat's former CEO, Defendant Clark, as Symantec's CEO, and appointed Blue Coat's former CFO, Defendant Noviello, as Symantec's Executive Vice President and CFO.

## Governing Accounting Standards

97.     GAAP sets forth guidelines for financial accounting used in preparing financial statements.  The SEC has the authority to codify GAAP.  Under SEC Regulation S-X (17 C.F.R. Part 210), financial statements filed with the SEC that are not presented in accordance with GAAP are presumed to be misleading, despite accompanying footnotes or other disclosures.  Symantec represented several times during the Relevant Period that its financial statements were provided in conformity with GAAP.

98.     Pursuant to GAAP, the Company can only recognize revenue when certain criteria are met and in those periods when the criteria are met.  If a company misleadingly shifts revenue from one period to another for the purpose of improving the perception of that period, GAAP is violated.  Per GAAP, revenue must be recognized in the proper period.

99.     Per Accounting Standards Codification ("ASC") 605-10-25-1, revenue may be recognized when it is realized or realizable and earned.  Specifically, per ASC Topic 605, "Revenue and gains are realized when products (goods or services), merchandise or other assets are exchanged for cash or claims to cash . . . .  [R]evenue and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash."  ASC Topic 605 moreover states:

> Revenue is not recognized until earned. . . .  [A]n entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by revenues.

100.    Basic revenue recognition criteria for software licenses is set forth in ASC 985-605-25-3, Software Not Requiring Significant Production, Modification, or Customization, which states:

> If the arrangement does not require significant production, modification, or customization of software, revenue shall be recognized when all of the following criteria are met:
>
> a.  Persuasive evidence of an arrangement exists;
>
> b.  Delivery has occurred;
>
> c.  The vendor's fee is fixed or determinable; and
>
> d.  Collectability is probable.

101.    ASC 605-25-16 provides, as to subpart a.:

> If the vendor operates in a manner that does not rely on signed contracts to document the elements and obligations of an arrangement, the vendor should have other forms of evidence to document the transaction (for example, a purchase order from a third party or online authorization). If the vendor has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties.

102.    As to acceptance by customers, ASC 958-605-25-21 states, "After delivery, if uncertainty exists about customer acceptance of the software, license revenue shall not be recognized until acceptance occurs."

103.    As to the probability of collectability, ASC 985-605-25-34 states that "any extended terms in a software licensing arrangement may indicate that the fee is not fixed or determinable."

104.    The Company's revenue recognition policy, which was included in Symantec's financial statements, stated that the Company "recognize[s] revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is probable."

105.    Thus, under the Company's revenue recognition policy and under GAAP, revenues must not be recognized if uncertainty exists about customer acceptance of the software, unless and until the vendor has documentation of the transaction or the underlying contract and agreement is executed and in the hands of management prior to the end of an accounting period, and/or if extended terms in the software licensing arrangement show that the fee is not fixed or determinable.

106.    Deferred revenue refers to payments received by a company for services or product to be performed or delivered in the future, and is recorded as a liability.  When a company bills a customer before satisfying GAAP's revenue recognition criteria, including that the delivery of the service or goods has occurred, deferred revenue is recorded.  A company violates GAAP if it recognizes deferred revenue that is not realized or realizable and earned, and doing so makes a financial statement misleading.

107.    In earnings releases and in its financial statements issued during the Relevant Period, the Company reported non-GAAP financial measures, which allowed the Individual Defendants to present an adjusted portrayal of Symantec's past and/or future financial performance.  Adjusted non-GAAP financial measures usually remove the impact of certain expenses and revenues that may be non-recurring or that are not part of a company's core operations.  The Individual Defendants used non-GAAP financial measures almost exclusively when discussing the Company's financial performance, as well as in planning and forecasting future fiscal periods.  Symantec also used these adjusted figures to determine executive compensation, including stock grants and bonuses.

108.    As a result of the proliferation of companies relying on adjusted metrics, the SEC has issued regulations, rules, and guidance that are applicable when a company publicly discloses

or releases financial information that includes such metrics.  Regulation G (17 C.F.R. § 244.100) applies to adjusted measure disclosures, and prohibits a company from making an adjusted financial measure public that is misleading or omits material facts.   Regulation G specifically states:

> A registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure and any other accompanying discussion of that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

109.    SEC Regulation S-K, Item 10 (17 C.F.R. § 229.10) prohibits a company from making an SEC filing containing an adjusted measure that adds back expenses related to the company's ordinary course of business, i.e., recurring.  SEC Regulation S-K, Item 10 states:

> A registrant must not: (B) Adjust a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is reasonably likely to recur within two years or there was a similar charge or gain within the prior two years.

110.    The SEC has issued guidance relating to disseminating adjusted financial measures, including in its "Compliance & Disclosure Interpretations," which contains questions and answers relating to adjusted financial measures.  Question and answer 100.01 states:

> **Question:** Can certain adjustments, although not explicitly prohibited, result in a non-GAAP measure that is misleading?

> **Answer:** Yes. Certain adjustments may violate Rule 100(b) of Regulation G because they cause the presentation of non-GAAP measures to be misleading. For example, presenting a performance measure that excludes normal, recurring, cash operating expenses necessary to operate a registrant's business could be misleading.

111.    The SEC's Division of Corporate Finance has also published guidance concerning disclosing adjusted financial measures, stating that "[i]f management is presenting the non-GAAP

calculation as an alternative or pro forma measure of performance, the staff discourages adjustments to eliminate or smooth items characterized as nonrecurring, infrequent, or unusual."

112.    The Individual Defendants caused the Company to improperly exclude ongoing consulting charges and additional continuing costs from its adjusted measures, making them misleading.

113.    The Individual Defendants also specifically recorded continuing non-transition operating expenses as transition costs and adjusted their operating income metric for such transition costs, which was improper.  These supposed transition costs were actually recurring operating expenses that the Company had incurred in the ordinary course of business.  The Individual Defendants caused the Company to misclassify non-transition related costs as "unique" transition costs, which was especially misleading as it gave a false and misleading picture of the value of Symantec's business operations.  The Individual Defendants' misconduct allowed the Company to capitalize costs over a period of time instead of, as required, recording them as expenses when they were incurred.  The Individual Defendants also caused the Company to improperly classify certain operational expenses as transition costs, such as costs related to implementing internal cloud-based software.  Ultimately, the Individual Defendants minimized current period operational expenses and spread the charges across multiple periods.

114.    SEC regulations and rules prohibit adjustments made to "eliminate or smooth items characterized as nonrecurring, infrequent or unusual."  Thus, the Company's classification of costs as nonrecurring transition costs was in violation of SEC rules, including Regulation S-K which bans a company from making SEC filings containing a non-GAAP measure adding back expenses related to the ordinary course of business.

115.    The Company's adjustment for recurring costs made its adjusted operating income figure and its description of transition costs in its financial statements false and misleading.  The Company in fact admitted issues with its transition expenses on September 24, 2018, stating:

> The Audit Committee noted relatively weak and informal processes with respect to some aspects of the review, approval and tracking of transition and transformation expenses. The Audit Committee also observed that beginning in the second quarter of fiscal year 2018 (ended September 29, 2017), the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures.

116.    The Individual Defendants also caused the Company to report additional misleading financial figures, including those dependent on the Company's misleading adjusted revenue and operating income figures.  The Company calculated operating margin by dividing operating income by revenue, and its adjusted earnings per share by dividing preferred dividends by the weighted average of common shares, and subtracting this subtotal from operating income. Due to reliance on the Company's misleading adjusted operating income and revenue figures, the Company's adjusted operating margin and earnings per share figures were also misleading.

117.    In causing the Company to report misleading adjusted financial measures, omit material facts, and/or excluding expenses in an adjusted measure related to Symantec's ordinary course of business, the Individual Defendants caused the Company to violate GAAP and SEC Regulations, including Regulation G and Regulation S-K.

### The Compensation Misconduct

118.    During the Relevant Period, in breach of their fiduciary duties, the Individual Defendants caused the Company to award certain of its executives excessive and unwarranted compensation that was derived from manipulated financial results.  The Individual Defendants, *inter alia*, caused the Company to improperly recognize revenue and improperly record operating

expenses incurred in the ordinary course of business as transition costs, allowing the Company to report inflated figures that would in turn increase executive compensation.

119.     As reported in a Form 8-K filed with the SEC on June 26, 2017, Symantec's named executive officers, including Defendants Clark and Noviello, are eligible for "performance-based incentive bonuses based on the Company's achievement of targeted non-GAAP revenue and non-GAAP operating income for fiscal year 2018."

120.     During the Relevant Period, the Individual Defendants caused the Company to improperly add back millions in deferred revenue connected with the LifeLock and Blue Coat acquisitions that was required to be written off under GAAP in calculating non-GAAP financial measures used to determine executive compensation, thereby inflating executive compensation.

121.     The purpose of the Individual Defendants' scheme was to increase the financial compensation of Defendants Clark and Noviello and other executive officers of Symantec.

122.     The Individual Defendants' misconduct resulted in an investigation by the Audit Committee as well as a decline in the value of the Company, and, correspondingly, shareholder value.

123.     According to a press release issued by Symantec on May 14, 2018, the Audit Committee's investigation was spurred by concerns raised by a former employee related to "the Company's public disclosures including commentary on historical financial results, its reporting of certain Non-GAAP measures including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation."

124.     The 2017 Proxy Statement sets fort Symantec's practices and philosophy for executive compensation. Among other things, it states that Symantec's policies provide "direct alignment with stockholders," and that Symantec utilizes "responsible pay policies to reinforce

strong governance and enhance stockholder alignment."   The 2017 Proxy Statement states, in relevant part:

**OUR EXECUTIVE COMPENSATION PHILOSOPHY AND PRACTICES**

The overriding principle driving our compensation programs continues to be our belief that it benefits our employees, customers, partners and stockholders to have management's compensation tied to our near- and long-term performance. Our pay programs reward achievement of challenging performance goals that align with our business strategy. We measure shorter-term results, though the majority emphasis is placed on long-term equity compensation that provides direct alignment with stockholders. We use responsible pay policies to reinforce strong governance and enhance stockholder alignment.

| Base Salary | Annual Incentives | Long-Term Incentives |
|---|---|---|
| • Aligned with role, contributions, and competitive market practice<br>• Supports attraction and retention of talent | • 50% Revenue (non-GAAP)<br>• Encourages overall company growth, a key shareholder value driver | • 70% Performance Units (PRUs)*<br>• Special 1-time design that reinforces the multi-year business transformation and aligns to stockholder value generation*<br>• Measures Operating Income (non-GAAP) at the end of fiscal 2018 to assess achievement of growth and cost reduction goals |
| **Pay Policies** | 50% Operating Income (non-GAAP)<br>• Provides a strong focus on cost control, aligns with shareholder value growth | • 30% time-vested restricted stock units (RSUs)<br>• Promotes retention and shareholder alignment |
| • Ownership guidelines<br>• No hedging/pledging<br>• Clawback policy<br>• Double-trigger equity | | |

125.    The 2017 Proxy Statement, in addition to the Company's Form 10-K/A filed on July 25, 2017 with the SEC for the Company's fourth quarter and fiscal year ended March 31, 2017, disclosed Symantec's executive compensation targets and payouts for the fiscal year.  Under Symantec's executive compensation plan, Company executives received compensation based on their achievement of a percentage of the fiscal year 2017-2018 adjusted revenue target of $4.04-4.12 billion and an adjusted operating income target of $1.13 billion.

126.    As stated in the Company's July 25, 2017 Form 10-K/A:

For the fiscal 2017 non-GAAP operating income metric, (a) at the threshold achievement level of 95.4% of target, the funding level is 50%; (b) above the threshold achievement level, the funding level increases incrementally, up to a funding level of 100% at a target achievement level of 100%; (c) above the target achievement level, funding increases incrementally, up to a cap of a 150% funding based on a maximum achievement level of at least 109.1% of target and (d) there is zero funding below the threshold achievement level of 95.4%. For the non-GAAP revenue metric: a) we established a target achievement range of $4.04 billion to $4.12 billion, where the funding level is 100% for the achievement of the levels between this range, b) below the threshold achievement level of $4.04 billion, the funding level is 0%; c) above the $4.12 billion achievement level, funding increases incrementally, up to a cap of a 150% funding based on a maximum achievement level of at $4.162 billion.

127.    For non-GAAP revenue, if adjusted revenue fell below the achievement level of $4.04 billion, there was no award compensation.  Similarly, if non-GAAP operating income fell below the threshold achievement level of 95.4%, there was no compensation award.

128.    Symantec additionally includes incentive awards in addition to cash incentives in its 2016-2017 fiscal year executive compensation plan, which includes the awarding of performance-based restricted stock units ("PRUs").  Per the Company's plan, executives received specified levels of PRUs based on Symantec's reaching a percentage of $1.56 billion, the adjusted fiscal 2017-2018 non-GAAP operating income target.  For the 2017-2018 fiscal year, Symantec stated that it reached a 109.2% achievement on its adjusted non-GAAP operating income target, or $1.7 billion, which resulted in a payout of 268.2% of target under the full year 2017 PRUs.  Per the terms of the full year 2017 PRUs, 250% of the plan payout was earned at the end of the fiscal year, and the additional 18.2% is eligible to be earned at the end of the 2018-2019 fiscal year if the executive still works for the Company through the end of that fiscal year.

129.    The Individual Defendants caused the Company to improperly recognize revenue in violation of GAAP and the Company's own policy concerning revenue recognition.  The Individual Defendants, *inter alia*, caused Symantec to recognize revenue at period-end on sales

that did not go through appropriate channels of approval, involved unapproved extended terms, did not have signed contracts, and/or for which payments would or could not be made by customers.  The Individual Defendants moreover caused the Company to improperly accelerate the recognition of deferred revenue before that revenue had met GAAP's revenue recognition criteria, i.e., the Company recognized revenue before it was realized or realizable and earned.  The overstated GAAP revenue figures that were disseminated and/or caused to be disseminated by the Individual Defendants allowed them to achieve higher compensation targets and allowed them to project increased growth for the Company.

130.    As disclosed by the Company on September 24, 2018, the Company should have deferred, but instead recognized, revenue in its fourth quarter 2018 and first quarter 2019 financial statements and related earnings releases.  As noted by the Company:

> [T]he Audit Committee reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018 (which is still an open period). After subsequent review of the transaction, the Company has concluded that $12 million of the $13 million should be deferred. Accordingly, the previously announced financial results for the fourth quarter of fiscal year 2018 and the first quarter of fiscal year 2019 (ended June 29, 2018) will be revised to take into account this deferral and any other financial adjustments required as a result of this revision.

131.    The Company's non-GAAP revenue metric was comprised with its reported GAAP revenue, which was adjusted for deferred revenue that was written down in conjunction with the Company's acquisitions—referred to as "deferred revenue fair value adjustment." The Company's adjusted revenue metric was inflated, and thus false and misleading, because the metric included revenue that did not satisfy GAAP revenue recognition criteria.

132.    In setting and awarding executive compensation, the Company also used non-GAAP operating income as a metric.  Symantec calculated this metric by subtracting the Company's adjusted operating expenses from its adjusted operating income.  The adjusted

38

expenses removed the Company's transition costs, which the Company described as costs that it did not incur in the ordinary course of business.  Notably, the Company stated during the Relevant Period that the Company reported non-GAAP financial measures and excluded charges such as transition costs "to facilitate a more meaningful evaluation of our current operating performance and comparisons to our past operating performance."

133.   The 2017 Proxy Statement noted that for the fiscal year ended March 31, 2017, Symantec reached $4.09 billion in revenue, or a 100% achievement on its revenue target, and $1.197 billion in operating income, or a 104.7% achievement on its operating income target. Symantec ultimately approved a payout of 111.5% of the target incentive award for Defendants Clark and Noviello, who consequently received $743,333 and $479,673 bonuses, respectively.

134.   Due to the Individual Defendants' manipulation of Symantec's adjusted operating income figures, Defendant Clark received over $41.5 million in Company stock at the end of the 2017-2018 fiscal year and is eligible to receive an additional $3 million in company shares at the end of fiscal year 2018-2019.  Defendant Noviello received almost $10.5 million in Company stock at the end of the 2017-18 fiscal year, and is eligible to receive $764,398 in Company stock at the end of fiscal 2018-2019.

135.   The Individual Defendants also caused the Company to design a full year 2017-2018 PRU plan whereby the Company's reported fiscal year 2018 non-GAAP EPS was chosen to determine the number of PRUs to be awarded in year one of the plan.  For the 2017-2018 fiscal year, the Company's non-GAAP earnings per share target under the full year 2017-2018 PRU plan was $1.64 per share, with a threshold performance level of $1.56 per share.  Symantec reported for the 2017-18 fiscal year that it achieved a fiscal year 2017-2018 non-GAAP earnings per share of $1.56 per share, or 95.2% of this metric, which led to the threshold level being achieved and

50.5% of the full year 2017-2018 year one shares becoming eligible to be earned at the end of fiscal 2019-2020, the end of the full year 2017-2018 PRU plan performance period.

136.    As a result of the Individual Defendants manipulation of Symantec's non-GAAP earnings per share figure, Defendant Clark is eligible to receive 85,768 Company shares with a value at grant date of nearly $3 million at the end of fiscal year 2019-2020, and Defendant Noviello is eligible to receive over 40,000 Company shares with a value at grant date of over $1.3 million at the end of fiscal 2019-2020.

## False and Misleading Statements During the Relevant Period

137.    As a result of the Individual Defendants' scheme, and as described further below, certain of the Company's statements directed at the investing public were materially false and misleading during the Relevant Period. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact.

### *May 10, 2017 Form 8-K*

138.    On May 10, 2017, the Company filed with the SEC a current report on Form 8-K with an attached press release announcing its financial results for its fourth fiscal quarter and fiscal year ended March 31, 2017, which stated, in relevant part:

- Q4 GAAP revenue $1.115 billion, up 28% year over year; non-GAAP revenue $1.176 billion, up 35% year over year
- Fiscal Year 2017 (FY17) GAAP revenue $4.019 billion, up 12% year over year; non-GAAP revenue $4.163 billion, up 16% year over year
- Q4 Enterprise Security segment GAAP revenue up 40%; FY17 Enterprise Security segment GAAP revenue up 22%
- Q4 Consumer Digital Safety segment GAAP revenue up 13%; FY17 Consumer Digital Safety segment GAAP revenue flat vs. FY16; LifeLock revenue contribution ahead of expectation; forecasting Consumer Digital Safety segment growth in FY18
- Realized over $300 million of run rate cost efficiencies and integration synergies exiting fiscal 2017, ahead of plan

- Debt repayment plan ahead of schedule; on track to complete existing $500 million accelerated share repurchase in Q1 fiscal year 2018
- Raises prior FY2018 EPS guidance

139.   On May 10, 2017, the Company also held an earnings call to discuss its fourth quarter and fiscal year financial results, wherein Defendant Clark touted Symantec's financial performance and outlook, stating, in relevant part:

Enterprise Security profitability has improved dramatically with Q4 fiscal year 2017 operating margins up 17 points year-over-year. Consumer Security revenue growth performed better than our guidance and LifeLock came in above our revenue expectations as well. Overall, we continue to perform ahead of plan on our cost efficiencies and synergies. Total company margins were at the high end of our guidance. And as a result, we delivered EPS at the high end of our guidance, including LifeLock.

* * *

Consumer Security exceeded the high end of our revenue guidance on an organic basis and LifeLock performed above revenue expectations with strong underlying growth metrics. LifeLock renewal rates increased year-over-year and cumulative ending numbers were up 8% year-over-year. This is an impressive result amidst the significant acquisition and integration activity.

140.   Also during the call, Defendant Noviello commented on the Company's adjusted operating margin, stating, in relevant part:

Our fourth quarter non-GAAP revenue was $1.176 billion[.]

* * *

Non-GAAP operating margin for the fourth quarter was 27%. . . . Operationally, our strong non-GAAP operating margin was driven by continued execution against our cost-savings initiatives and synergies.

Fully diluted non-GAAP earnings per share was $0.28 . . . . Excluding LifeLock, fully diluted non-GAAP earnings per share was $0.29, at the high end of our $0.27 to $0.29 guidance range.

* * *

Enterprise non-GAAP operating margin was 16%, up 17 points year-over-year.

41

* * *

Our Consumer Security segment non-GAAP . . . operating margin was 42%.

* * *

Including LifeLock, non-GAAP operating margin remained at 29%. Non-GAAP EPS was $1.18, including a $0.01 headwind from LifeLock, which is an increase of 15% year-over-year and above our original guidance of $1.06 to $1.10 provided in May 2016.

### *2016-2017 10-K*

141.    On May 19, 2017, the Company filed with the SEC its annual report on Form 10-K for its fiscal fourth quarter and year ended March 31, 2017 (the "2016-2017 10-K"), which was signed by Defendants Clark, Noviello, Garfield, Schulman, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Unruh, and Vautrinot.  The 2016-17 10-K affirmed results presented in the Company's May 10, 2017 Form 8-K and press release, and reported a deferred revenue balance of $2.353 billion as of March 31, 2017.

142.    The 2016-2017 10-K asserted that management had concluded that the Company's internal control over financial reporting was effective as of March 31, 2017, stating, in relevant part:

**Item 9A. Controls and Procedures**

**a) Evaluation of Disclosure Controls and Procedures**

The SEC defines the term "disclosure controls and procedures" to mean a company's controls and other procedures that are designed to ensure that information required to be disclosed in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the SEC's rules and forms. "Disclosure controls and procedures" include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our disclosure controls and procedures are designed to provide reasonable assurance that such information is accumulated and

communicated to our management. Our management (with the participation of our Chief Executive Officer and Chief Financial Officer) has conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act). Based on such evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of the end of the period covered by this report.

**b) Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) for Symantec. Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, has conducted an evaluation of the effectiveness of our internal control over financial reporting as of March 31, 2017, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

In accordance with guidance issued by the Securities and Exchange Commission, companies are permitted to exclude acquisitions from their final assessment of internal control over financial reporting for the first fiscal year in which the acquisition occurred. Our management's evaluation of internal control over financial reporting excluded the internal control activities of Blue Coat and LifeLock, which we acquired in August 2016 and February 2017, respectively, as discussed in Note 6 to the Consolidated Financial Statements. We have included the financial results of Blue Coat and LifeLock in the Consolidated Financial Statements from the dates of acquisition. Total revenues subject to Blue Coat's internal control over financial reporting represented approximately 11% of our consolidated revenues for the fiscal year ended March 31, 2017. Total assets subject to Blue Coat's internal control over financial reporting represented approximately 4% of our consolidated total assets as of March 31, 2017. Total revenues subject to LifeLock's internal control over financial reporting represented approximately 2% of our consolidated revenues for the fiscal year ended March 31, 2017. Total assets subject to LifeLock's internal control over financial reporting represented approximately 2% of our consolidated total assets as of March 31, 2017. Blue Coat's and LifeLock's goodwill and intangible assets were subject to our management's evaluation of internal control over financial reporting.

Our management has concluded that, as of March 31, 2017, our internal control over financial reporting was effective at the reasonable assurance level based on these criteria.

The Company's independent registered public accounting firm has issued an attestation report regarding its assessment of the Company's internal control over financial reporting as of March 31, 2017, which is included in Part IV, Item 15 of this annual report.

**c) Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting during the quarter ended March 31, 2017, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

143.    The 2016-2017 10-K stated, with respect to "Executive Compensation," that "The information required by this item will be included under the caption 'Executive Compensation' in our 2017 Proxy Statement and is incorporated herein by reference."

144.    The 2016-2017 10-K additionally noted that "[t]he accompanying consolidated financial statements of Symantec and our wholly-owned subsidiaries are prepared in conformity with generally accepted accounting principles in the United States." Moreover, the 2016-2017 10-K provided Symantec's revenue recognition policy, noting that the Company "recognize[s] revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is probable."

145.    The 2016-2017 Form 10-K reported non-GAAP revenue of $1.17 billion for the fourth quarter and $4.16 billion for the fiscal year, and reported non-GAAP operating income of $314 million for the fourth quarter and $1.19 billion for the fiscal year. The 2016-2017 10-K also reported "Restructuring, separation, transition, and other" expenses of $72 million for the fourth quarter and $273 million for the year.

146.    The 2016-2017 10-K reported that Symantec incurred $94 million in transition costs during the year, and provided a description of the type of costs Symantec recorded as transition costs, stating, in relevant part:

Note 4. Restructuring, Separation, Transition, and Other Costs

. . . . Transition costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes.

* * *

> We incurred $94 million in continuing operations transition expense during fiscal 2017.

147.    The 2016-2017 10-K also noted how the Company's adjusted financial measures for the relevant periods were derived.  As to adjusted operating expenses, the 2016-2017 10-K stated that the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, separation, transition, and other," and removes operating expenses of $72 million for the fourth quarter and $273 million for the fiscal year.

148.    The 2016-2017 10-K provided the Company's reasoning for making its "Restructuring, separation, transition and other" adjustment, stating, in relevant part:

> Restructuring, separation, transition and other: We have engaged in various restructuring, separation, transition, and other activities over the past several years that have resulted in costs associated with severance, facilities, transition, and other related costs. . . . Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes. . . . Each restructuring, separation, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope. We do not engage in restructuring, separation, transition, or other activities in the ordinary course of business.

149.    Attached to the 2016-2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Clark and Noviello attesting to the accuracy of the 2016-2017 10-K.

### *August 2, 2017 Form 8-K*

150.    On August 2, 2017, the Company filed with the SEC a current report on Form 8-K with an attached press release announcing its financial results for its first fiscal quarter ended June 30, 2017, which stated, in relevant part:

- Enterprise Security and Consumer Digital Safety segment revenue exceed first quarter GAAP and non-GAAP guidance

- Q1 GAAP revenue $1.175 billion, up 33% year over year; non-GAAP revenue $1.228 billion, up 39% year over year
- Consumer Digital Safety returned to growth
- Operating margin beats Q1 GAAP and non-GAAP guidance; cost efficiencies and integration synergies ahead of plan

151.    The Form 8-K also reported non-GAAP operating income of $221 million.

***August 2, 2017 Earnings Call***

152.    On August 2, 2017, Symantec held an earnings call to discuss its first quarter results, during which Defendant Noviello touted Symantec's adjusted operating margin and earnings per share, stating, in relevant part:

> Operating margin for the first quarter was 31%, above our guided range of 27% to 29%, driven by top line outperformance and continued execution against our cost savings initiatives and synergies. We remain ahead of schedule to achieve our expected net cost efficiencies as well as our expected Blue Coat and LifeLock cost synergies, which gives us further confidence around our guidance and the significant increase in operating margins we expect this year. . . . Fully diluted earnings per share was $0.33, above our $0.28 to $0.32 guidance range.

> Enterprise Security operating margin was 17%, up 11 points year-over-year, driven by our cost savings initiatives.

> Q1 FY '18 Consumer Digital Safety operating margin was 47%, driven in part by top line growth and the faster realization of LifeLock synergies.

***Q1 2016-2017 10-Q***

153.    On August 4, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2017 (the "Q1 2017-2018 10-Q"), which was signed by Defendants Clark and Noviello.  The Q1 2017-2018 10-Q affirmed results presented in the Company's August 2, 2017 press release, and reported a deferred revenue balance of $2.32 billion as of June 30, 2017.

154.    The Q1 2017-2018 10-Q asserted that Symantec's disclosure controls and procedures were effective, stating, in relevant part:

**Item 4.** *Controls and Procedures*

*(a) Evaluation of Disclosure Controls and Procedures*

The Securities and Exchange Commission ("SEC") defines the term "disclosure controls and procedures" to mean a company's controls and other procedures that are designed to ensure that information required to be disclosed in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the SEC's rules and forms. "Disclosure controls and procedures" include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our disclosure controls and procedures are designed to provide reasonable assurance that such information is accumulated and communicated to our management. Our management (with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO")) has conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act). Based on such evaluation, our CEO and our CFO have concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of the end of the period covered by this report.

*(b) Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting during the three months ended June 30, 2017, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

155.    The Q1 2017-2018 10-Q affirmed that the Company financial statements were prepared in accordance with GAAP and that the Company adhered to its revenue recognition policies.  The Q1 2017-2018 10-Q also stated that there:

have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements during the three months ended June 30, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017.

156.    The Q1 2017-2018 10-Q additionally reported "Restructuring, transition, and other" expenses of $88 million for the first quarter.  The Q1 2017-2018 10-Q commented on this line item, stating, in relevant part:

> Note 4. Restructuring, Transition and Other Costs
>
> . . . . Transition costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes.
>
> [W]e expect continuing significant transition costs associated with the implementation of a new enterprise resource planning system and costs to automate business processes.

157.    Moreover, the Q1 2017-2018 10-Q reported that the Company incurred $28 million in transition costs over the quarter.

158.    The Q1 2017-2018 10-Q also noted how the Company's adjusted financial measures for the relevant periods were derived.  As to adjusted operating expenses, the Q1 2017-2018 10-Q stated that the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, separation, transition, and other," and removes operating expenses of $88 million for the first quarter.

159.    The Q1 2017-2018 10-Q provided the Company's reasoning for making its "Restructuring, separation, transition and other" adjustment, stating, in relevant part:

> Restructuring, transition and other: We have engaged in various restructuring, transition and other activities over the past several years that have resulted in costs associated with severance, facilities, transition, and other related costs. Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes. . . . Each restructuring, transition and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope. We do not engage in restructuring, transition or other activities in the ordinary course of business.

160.    Attached to the Q1 2017-2018 10-Q were SOX certifications signed by Defendants Clark and Noviello attesting to its accuracy.

***2017 Proxy Statement***

161.    On August 16, 2017, the Company filed the 2017 Proxy Statement.  Defendants Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[10]

162.    The 2017 Proxy Statement stated, as to executive compensation:

## OUR EXECUTIVE COMPENSATION PHILOSOPHY AND PRACTICES

The overriding principle driving our compensation programs continues to be our belief that it benefits our employees, customers, partners and stockholders to have management's compensation tied to our near- and long-term performance. Our pay programs reward achievement of challenging performance goals that align with our business strategy. We measure shorter-term results, though the majority emphasis is placed on long-term equity compensation that provides direct alignment with stockholders. We use responsible pay policies to reinforce strong governance and enhance stockholder alignment.

---

[10] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

| Base Salary | Annual Incentives | Long-Term Incentives |
|---|---|---|
| • Aligned with role, contributions, and competitive market practice<br>• Supports attraction and retention of talent | • 50% Revenue (non-GAAP)<br>• Encourages overall company growth, a key shareholder value driver | • 70% Performance Units (PRUs)*<br>• Special 1-time design that reinforces the multi-year business transformation and aligns to stockholder value generation*<br>• Measures Operating Income (non-GAAP) at the end of fiscal 2018 to assess achievement of growth and cost reduction goals |
| **Pay Policies**<br>• Ownership guidelines<br>• No hedging/pledging<br>• Clawback policy<br>• Double-trigger equity | • 50% Operating Income (non-GAAP)<br>• Provides a strong focus on cost control, aligns with shareholder value growth | • 30% time-vested restricted stock units (RSUs)<br>• Promotes retention and shareholder alignment |

163.    The 2017 Proxy Statement noted that "We have adopted a code of conduct that applies to all of our Board members, officers and employees. We have also adopted a code of ethics for our Chief Executive Officer and senior financial officers, including our principal financial officer and principal accounting officer."

164.    The 2017 Proxy Statement stated that "our Insider Trading Policy prohibits our directors, officers, employees and contractors from purchasing or selling Symantec securities while in possession of material, non-public information."

165.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, Symantec's Code of Conduct was not followed, as multiple Individual Defendants engaged in insider trading, while allowing false and misleading statements to be issued to the investing public, and allowed retaliation against employees reporting violations of the Code of Conduct.

166.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay for performance" elements based on non-GAAP financial measures while failing to disclose that such measures were being artificially inflated by the Individual Defendants' accounting misconduct,

and therefore any compensation based on the Company's financial performance was artificially inflated.

167.    The 2017 Proxy Statement also failed to disclose that: (1) the Company improperly recognized revenue in violation of GAAP and SEC regulations, including by accelerating the recognition of deferred revenue that had not met GAAP revenue recognition criteria, and thus overstated its adjusted revenue and adjusted operating income; (2) the Company was not in compliance with its own policy on internal revenue recognition; (3) the Company utilized a "Restructuring, separation, transition and other" adjustment to entirely remove Symantec's "transition costs" from its adjusted operating expenses, despite that this line item consisted of recurring and continuing operating expenses incurred in the ordinary course of business, and thus this line item and the Company's transition costs were misstated; (4) the Company's operating margin, earnings per share, and adjusted operating income figures, which were derived using the above misleading metrics, were also misstated; (5) as a result of the Company's use of certain non-GAAP measures, the Company would be subject to an investigation by the SEC; (6) the Company retaliated against employees; (7) the Compensation Misconduct was occurring; (8) the Company was manipulating financial metrics to falsely indicate that the Company and its strongly-promoted Blue Coat and LifeLock acquisitions were successful; and (9) the Company failed to maintain internal controls.

### November 1, 2017 Form 8-K

168.    On November 1, 2017, the Company filed a current report on Form 8-K with the SEC with an attached press release announcing the Company's financial results for its second fiscal quarter ended September 29, 2017, which stated:

- Q2 GAAP revenue $1.240 billion, up 27% year over year; non-GAAP revenue $1.276 billion, up 26% year over year

- Strong Enterprise business activity from market-leading Integrated Cyber Defense platform; double digit year-over-year deferred revenue growth excluding impact from divestiture
- Consumer Digital Safety revenue exceeds expectations, driven by strong retention and growth in average revenue per user
- Completed previously announced cost reduction and synergy programs ahead of schedule

169.    The Form 8-K additionally reported non-GAAP operating income of $435 million.

***November 1, 2017 Earnings Call***

170.    On November 1, 2017, the Company held an earnings call to discuss its second quarter financial results, during which Defendant Noviello touted certain of the Company's adjusted financial results, stating, in relevant part:

> Operating margin for the second quarter was 34%, at the low end of our prior guidance range of 34% to 36%. Overall spending finished the quarter on track – finished on track for the quarter despite increased marketing cost in our Consumer Digital Safety segment and headwinds from M&A and divestiture-related costs, which totaled approximately $20 million.
>
> * * *
>
> Fully diluted earnings per share was $0.40, at the low end of our prior guidance range, impacted by the mix of lower in-quarter recognized revenue versus deferred revenue in our Enterprise Security segment and approximately $0.02 from the combination of increased marketing costs in our Consumer Digital Safety segment and headwinds from M&A and divestiture-related costs.

***Q2 2017-2018 10-Q***

171.    On November 3, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for its second fiscal quarter ended September 29, 2017 (the "Q2 2017-2018 10-Q"), which was signed by Defendants Clark and Noviello. The Q2 2017-2018 10-Q affirmed results presented in the Company's November 1, 2017 press release, and reported a deferred revenue balance of $2.04 billion as of September 29, 2017.

172.   The Q2 2017-2018 10-Q asserted that Symantec's disclosure controls and procedures were effective, stating, in relevant part:

### Item 4. *Controls and Procedures*

#### *(a) Evaluation of Disclosure Controls and Procedures*

The Securities and Exchange Commission ("SEC") defines the term "disclosure controls and procedures" to mean a company's controls and other procedures that are designed to ensure that information required to be disclosed in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the SEC's rules and forms. "Disclosure controls and procedures" include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our disclosure controls and procedures are designed to provide reasonable assurance that such information is accumulated and communicated to our management. Our management (with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO")) has conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act). Based on such evaluation, our CEO and our CFO have concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of the end of the period covered by this report.

#### *(b) Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting during the three months ended September 29, 2017, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

173.   The Q2 2017-2018 10-Q affirmed that the Company financial statements were prepared in accordance with GAAP and that the Company adhered to its revenue recognition policies.  The Q2 2017-2018 10-Q also stated that there:

have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements during the six months ended September 29, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017.

174.    The Q2 2017-2018 10-Q additionally reported "Restructuring, transition, and other" expenses of $97 million for the second quarter.  The Q2 2017-2018 10-Q commented on this line item, stating, in relevant part:

> Note 4. Restructuring, Transition and Other Costs
>
> Our restructuring, transition and other costs and liabilities consist primarily of severance, facilities, transition and other related costs. ... Transition costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems, costs to automate business processes and costs associated with divestitures of our product lines and businesses.
>
> * * *
>
> [W]e expect continuing significant transition costs[.]
>
> * * *
>
> During the first six months of FY18, we also incurred additional divestiture costs as a result of the divestiture of our WSS and PKI solutions, as well as costs associated with our other transition and transformation programs including the implementation of a new enterprise resource planning system and costs to automate business processes.

175.    The Q2 2017-2018 10-Q additionally noted that Symantec incurred an expense of $76 million in transition costs in the quarter and $120 million over the past two fiscal quarters.

176.    The Q2 2017-2018 10-Q also noted how the Company's adjusted financial measures for the quarter were derived.  As to adjusted operating expenses, the Q2 2017-2018 10-Q stated that the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects and adjustment for "Restructuring, separation, transition, and other," and removes operating expenses of $97 million for the second quarter.

177.    The Q2 2017-2018 10-Q provided the Company's reasoning for making its "Restructuring, separation, transition and other" adjustment, stating, in relevant part:

> Restructuring, transition and other:  . . . We have also engaged in various transition

and other activities which resulted in related costs primarily consisting of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes . . . . Each restructuring, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, each has differed from the others in terms of its operational implementation, business impact and scope, and the amount of these charges has varied significantly from period to period.

178.    Attached to the Q2 2017-2018 10-Q were SOX certifications signed by Defendants

Clark and Noviello attesting to its accuracy.

### *January 31, 2018 Form 8-K*

179.    On January 31, 2018, the Company filed with the SEC a current report on Form 8-

K with an attached press release announcing its financial results for its third fiscal quarter ended

December 29, 2017, which stated, in relevant part:

- Q3 GAAP revenue $1.209 billion, up 16% year-over-year; non-GAAP revenue $1.234 billion, up 13% year-over-year
- Double digit year-over-year deferred revenue growth
- Enterprise segment delivered strong implied billings growth; revenue below guidance range due to accelerating mix shift to ratable business
- Consumer Digital Safety segment achieved high end of revenue guidance range
- Operating margins beat Q3 GAAP and non-GAAP guidance; continued cost and operating efficiencies
- Cash flow from operations in fiscal year 2018 expected to be near the high-end of prior guidance range
- Enterprise customers accelerating adoption of Symantec's cloud solutions

180.    The Form 8-K also reported non-GAAP operating income of $463 million.

### *January 31, 2018 Earnings Call*

181.    On January 31, 2018, the Company held an earnings call to discuss its third quarter

financial results, during which Defendant Clark touted the Company's results, stating, in relevant

part:

> For Q3, even with our Enterprise revenue shortfall, we performed well against other financial metrics. Operating margin exceeded our guidance as we realized continued cost efficiencies. EPS benefited from those cost efficiencies as well as

from U.S. tax reform. And we generated strong cash flow from operations, which should benefit going forward from our strong business momentum, deferred revenue and the drop-off in costs associated with our restructuring initiatives.

\* \* \*

Now let me turn to our Consumer Digital Safety business which had a strong quarter. Recall that only 18 months ago, this business was in decline, with decreasing retention rates and ARPU. Today, our Consumer Digital Safety business has been transformed. Revenue in the third quarter was at the high end of our guidance range, with an organic growth rate of 4% year-over-year in constant currency. We experienced 53% operating margins and an increased ARPU.

182.    During the call, Defendant Noviello touted certain of the Company's financial figures, including its adjusted revenue and operating margin, stating, in relevant part:

Our third quarter revenue was $1.234 billion. This was comprised of Consumer Digital Safety revenue at the high end of our prior revenue guidance range and Enterprise Security revenue below the low end of our prior revenue guidance range.

\* \* \*

Operating margin for the third quarter was 38%, above the high end of our prior guidance range of 36% to 37%. The higher operating margin was the result of continued cost and operating efficiencies, including the completion of the net cost reduction and synergy programs we discussed last quarter across the business. Fully diluted earnings per share was $0.49, $0.03 above the high end of our prior guidance range.

### Q3 2017-2018 10-Q

183.    On February 2, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended December 29, 2017 (the "Q3 2017-2018 10-Q"), which was signed by Defendants Clark and Noviello. The Q3 2017-2018 10-Q affirmed results presented in the Company's January 31, 2018 press release, and reported a deferred revenue balance of $2.15 billion as of December 29, 2017.

184.    The Q3 2017-2018 10-Q asserted that Symantec's disclosure controls and procedures were effective, stating, in relevant part:

**Item 4. *Controls and Procedures***

56

***(a) Evaluation of Disclosure Controls and Procedures***

The Securities and Exchange Commission ("SEC") defines the term "disclosure controls and procedures" to mean a company's controls and other procedures that are designed to ensure that information required to be disclosed in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the SEC's rules and forms. "Disclosure controls and procedures" include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our disclosure controls and procedures are designed to provide reasonable assurance that such information is accumulated and communicated to our management. Our management (with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO")) has conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act). Based on such evaluation, our CEO and our CFO have concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of the end of the period covered by this report.

***(b) Changes in Internal Control over Financial Reporting***

There were no changes in our internal control over financial reporting during the three months ended December 29, 2017, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

185. The Q3 2017-2018 10-Q affirmed that the Company financial statements were prepared in accordance with GAAP and that the Company adhered to its revenue recognition policies. The Q3 2017-2018 10-Q also stated that there "have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements during the nine months ended December 29, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."

186.    The Q3 2017-2018 10-Q additionally reported "Restructuring, transition, and other" expenses of $93 million for the third quarter.  The Q3 2017-2018 10-Q commented on this line item expense, stating, in relevant part:

Note 4. Restructuring, Transition and Other Costs

Transition costs are incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes. In addition, transition costs include expenses associated with divestitures of our product lines.

187.    Moreover, the Q3 2017-2018 10-Q reported that the Company incurred $75 million in transition costs over the quarter and $195 million in transition costs over the past three fiscal quarters.

188.    The Q3 2017-2018 10-Q also noted how the Company's adjusted financial measures for the quarter were derived.  As to adjusted operating expenses, the Q3 2017-2018 10-Q stated that the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects and adjustment for "Restructuring, separation, transition, and other," and removes operating expenses of $93 million for the third quarter.

189.    The Q3 2017-2018 10-Q provided the Company's reasoning for making its "Restructuring, separation, transition and other" adjustment, stating, in relevant part:

Restructuring, transition and other costs: . . . Transition costs are associated with formal discrete strategic information technology initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes. In addition, transition costs include expenses associated with our divestitures. We exclude restructuring, transition and other costs from our non-GAAP results as we believe that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance, and that excluding these charges facilitates a more meaningful evaluation of our current operating performance and comparisons to our past operating performance.

190.    Attached to the Q3 2017-2018 10-Q were SOX certifications signed by Defendants Clark and Noviello attesting to its accuracy.

191.    The statements in ¶¶ 138-160 and 168-190 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the Company improperly recognized revenue in violation of GAAP and SEC regulations, including by accelerating the recognition of deferred revenue that had not met GAAP revenue recognition criteria, and thus overstated its adjusted revenue and adjusted operating income; (2) the Company was not in compliance with its own policy on internal revenue recognition; (3) the Company utilized a "Restructuring, separation, transition and other" adjustment to entirely remove Symantec's "transition costs" from its adjusted operating expenses, despite that this line item consisted of recurring and continuing operating expenses incurred in the ordinary course of business, and thus this line item and the Company's transition costs were misstated; (4) the Company's operating margin, earnings per share, and adjusted operating income figures, which were derived using the above misleading metrics, were also misstated; (5) as a result of the Company's use of certain non-GAAP measures, the Company would be subject to an investigation by the SEC; (6) the Company retaliated against employees; (7) the Compensation Misconduct was occurring; (8) the Company was manipulating financial metrics to falsely indicate that the Company and its strongly-promoted Blue Coat and LifeLock acquisitions were successful; and (9) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

192.    After markets closed on May 10, 2018, Symantec issued a press release which was also attached to a Form 8-K filed with the SEC the same day, titled "Symantec Reports Fiscal Fourth Quarter and Full Year 2018 Results." That press release revealed that an internal investigation had been initiated based on concerns raised by a former employee.

193.    The press release stated, in relevant part:

**Audit Committee Investigation**

The Audit Committee of the Board of Directors has commenced an internal investigation in connection with concerns raised by a former employee. The Audit Committee has retained independent counsel and other advisors to assist it in its investigation. The Company has voluntarily contacted the Securities and Exchange Commission to advise it that an internal investigation is underway, and the Audit Committee intends to provide additional information to the SEC as the investigation proceeds. The investigation is in its early stages and the Company cannot predict the duration or outcome of the investigation. The Company's financial results and guidance may be subject to change based on the outcome of the Audit Committee investigation. It is unlikely that the investigation will be completed in time for the Company to file its annual report on Form 10-K for the fiscal year ended March 30, 2018 in a timely manner.

194.    Within the Form 8-K, the Company altered its description of transition costs in its "Explanation of Non-GAAP Measures and Other Items" section, ceasing to describe transition costs as "continuing." The Company commented on the purported justification for removing these transition costs in calculating adjusted operating income, stating, "We exclude restructuring, transition and other costs from our non-GAAP results as we believe that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance."

195.    Also on May 10, 2018, the Company held an earnings call with analysts and investors. During the call, the Company's VP of Investor Relations, Cynthia Hiponia, stated the following regarding the Audit Committee investigation:

Lastly, as mentioned in the company's press release, the Audit Committee of the Board of Directors has commenced an internal investigation in connection with concerns raised by a former employee. The Audit Committee has retained independent counsel and other advisors to assist in its investigation. The company has voluntarily contacted the Securities and Exchange Commission to advise that an internal investigation is underway, and the Audit Committee intends to provide additional information to the SEC as the investigation proceeds.

The investigation is in its early stages and the company cannot predict the duration or outcome of the investigation. The company's financial results and guidance may be subject to change based on the outcome of the Audit Committee investigation. It is unlikely that the investigation will be completed in time for the company to file its Annual Report on Form 10-K for the fiscal year ended March 30, 2018, in a timely manner. The investigation does not relate to any security concern or breach with respect to our products or systems. Now because this is an ongoing matter, we will be unable to comment further on this topic during today's call and there will be no question-and-answer session following our prepared remarks.

196.    Also during the call, the Company announced that its guidance on expected revenue, earnings per share, and operating margin for the following quarter and fiscal year would be reduced far below its prior estimates, attributing the change to ratable sales in the Company's Enterprise segment as a result of the adoption of cloud solution in favor of on-premise appliances.

197.    On this news, the Company's share price dropped over 33%, or $9.66, from a closing price of $29.18 per share on May 10, 2018 to close at $19.52 per share on May 11, 2018.

198.    On May 14, 2018 the Company issued a second press release titled "Symantec Provides Additional Information," which provided updates on the Audit Committee investigation revealed on May 10, 2018. The May 14, 2018 press release stated, in relevant part:

MOUNTAIN VIEW, Calif. – May 14, 2018 – Symantec Corp. (NASDAQ: SYMC) today released an updated statement regarding the ongoing internal investigation by the Audit Committee previously announced on May 10, 2018. The Company also will provide information on its fiscal year 2019 financial guidance and fiscal year 2020 financial outlook on a conference call with the financial community to be held today.

Statement:

**The Audit Committee of the Board of Directors has commenced an internal investigation in connection with concerns raised by a former employee regarding the Company's public disclosures including**

***commentary on historical financial results, its reporting of certain Non-GAAP measures including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation***. The Audit Committee has retained independent counsel and other advisors to assist it in its investigation. The Company has voluntarily contacted the Securities and Exchange Commission to advise it that an internal investigation is underway, and the Audit Committee intends to provide additional information to the SEC as the investigation proceeds. The investigation is in its early stages and the Company cannot predict the duration or outcome of the investigation. The Company's financial results and guidance may be subject to change based on the outcome of the Audit Committee investigation. It is unlikely that the investigation will be completed in time for the Company to file its annual report on Form 10-K for the fiscal year ended March 30, 2018 in a timely manner. At this time, the Company does not anticipate a material adverse impact on its historical financial statements.

(Emphasis added.)

199.    Following the issuance of the press release, and also on May 14, 2018, the Company held a conference call with analysts and investors to discuss the investigation and its financial results for the quarter and year ended March 31, 2018.  During the conference call, Defendant Clark stated: "For anyone concerned about executive compensation at this time, I want to let you know that all discretionary and performance-based compensation for named executive officers is on hold pending the outcome of the Audit Committee investigation. This is welcomed by management."

200.    Also during the call, in response to an analyst's question about the investigation, Defendant Clark stated that "we can't answer any questions about the investigation. The statement that we wrote is as it stands, it's—please read it." Defendant Clark refused to answer any questions regarding the investigation throughout the conference call.

201.    On May 16, 2018, *Probes Reporter* published an article authored by John P. Gavin titled "Investors Are Right To Worry About Symantec: It Appears The SEC Has Been Investigating Since At Least April."  The article noted that "research suggests the SEC was already

investigating Symantec as early as [April 17, 2018]," which was not aligned with the Company's previous statement that it voluntarily notified the SEC about the whistleblower's concerns.  In support, the article cited an April 17, 2018 letter received from the SEC in response to a Freedom of Information Act request for information concerning the Company.  In denying the request, the SEC stated that it was withholding information under federal exemptions protecting from disclosure records compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement activities.  The article noted that this letter likely indicated that the SEC had contacted Symantec to request that the Company voluntarily produce information as part of an informal inquiry.

202.    On May 31, 2018, Credit Suisse issued a report providing opinions received from former assistant chief accountant for the SEC Ron Kiima, who noted his concerns about the Company's M&A accounting and revenue recognition and that he understood the investigation to involve Symantec's non-GAAP adjustments, including adjustments related to restructuring, transition, or other costs removed from the Company's reported adjusted metrics.

203.    On May 17, 2018, *MarketWatch* published an article authored by Francine McKenna, titled "Companies including Symantec are using 'ghost revenue' to calculate bonuses" (the "McKenna Article"). The article asserted that "[t]he SEC and the company are now investigating an employee's complaint about the practice of adding back millions in deferred revenue to calculate bonuses."

204.    The McKenna Article began by noting several firms that engage in practices similar or identical to the Individual Defendants' accounting misconduct and noted Symantec's share price drop:

> Companies like Broadcom Ltd. and Norwegian Cruise Line Holdings Ltd. are adding back millions in "ghost revenue" — deferred revenue that accounting

standards force them to write off after an acquisition — when calculating executive bonuses, an issue that is taking on new resonance after a former Symantec Corp. employee complained about the practice internally and prompted an audit committee investigation.

Last week, Symantec SYMC, +0.41% stock was hammered after it revealed it had started an investigation, and on Monday, the company said the probe had to do with "the company's public disclosures including commentary on historical financial results, its reporting of certain non- GAAP measures including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation."

\* \* \*

A spokeswoman for Symantec declined to elaborate.

205.    The McKenna Article then explained the concept of 'ghost revenue':

Acquiring companies often assign a fair value to deferred revenues—revenues that are collected in advance of actually earning them—added to their books that are less than the amount reported on the acquired companies' balance sheets when purchasing another company. Those writedowns are called "deferred revenue purchase accounting adjustments" and are required by Generally Accepted Accounting Principles or GAAP.

The write-downs become "ghost revenues" for the acquiring company that Symantec and some others are adding back into GAAP revenue numbers to create adjusted revenue metrics that are reported to investors.

Companies say the write-downs affect comparability and result in numbers that are not representative of what they would have produced if GAAP rules didn't make them eliminate the revenue.

SEC Deputy Chief Accountant Wesley Bricker has warned companies that any non-GAAP metrics that adjust revenue would likely receive a comment letter from SEC staff. Companies' rationale for these adjustments would be scrutinized "closely, and skeptically," Bricker told an audience in New York on May 5, 2016, right after the SEC's new non-GAAP guidelines were published.

"Revenue adjustments do more than just adjust from GAAP: they change the very starting point from which other performance analyses flow," said Bricker.

\* \* \*

"Non-GAAP adjustments or reconciliations to GAAP income typically adjust reported earnings for one-time or non-recurring items that show an 'improved' version of company performance," said Paul Chaney, the E. Bronson Ingram

Professor of Accounting at Vanderbilt University, in an interview with MarketWatch.

206.     The McKenna Article went on to discuss the accounting misconduct at Symantec:

Symantec said in its last annual report for the fiscal year ended March 2017 that accounting rules forced it to write down a total of $144 million of deferred revenues acquired with the purchase of Blue Coat and LifeLock.

**Blue Coat was acquired in August of 2016 and LifeLock in February 2017. On the date of the acquisitions Symantec attributed $220 million of the purchase price for both companies to deferred revenues. Symantec determined that it was required to write-off $144 million of this revenue, because the cost to fulfill the service contracts and actually earn the revenue was estimated to be greater than the amount already collected.**

However**, Symantec has been adding back some of the written-off revenue each period since the acquisitions. In its first fiscal 2018 quarter the company adjusted revenue upward by a total of $53 million. In the quarter ended September 29, 2017, Symantec increased GAAP revenue by $36 million of these deferred revenues that had already been written off**.

In its most recent earnings release, on May 10, for its fourth quarter ending March 30, Symantec said it believes that "eliminating the impact of this adjustment improves the comparability of revenues between periods" even though "the adjustment amounts will never be recognized in our U.S. GAAP financial statements."

It also said that it had completed the acquisition of LifeLock on February 9, 2017. It also noted that,

"Deferred revenue adjustments include deferred revenue acquired during the period and the change in deferred revenue related to Veritas discontinued operations."

That gives Symantec a "cookie jar" that can be used to boost the adjusted revenue metric that drives incentive compensation, Chaney said.

(Emphasis added.)

207.     Finally, the McKenna Article discussed the one-year time limit from acquisition for

adjusting the allocation of a purchase price among financial statement lines:

Chaney says companies have one year from the acquisition to adjust the amount of the purchase price allocated to various financial statement lines like deferred revenue. For Blue [Coat], that one year expired September 30, 2017. For LifeLock, the company can decide to allocate more to deferred revenue, as well as decide to

write off any or all of the remaining $76 million of deferred revenue for both companies.

"Every dollar they write down can at least be put to good use as an adjustment to GAAP revenue that increases incentive awards," Chaney told MarketWatch.

208.    On August 2, 2018, the Company announced its financial results for its first fiscal quarter ended June 29, 2018 and held an earnings call to discuss the results.  The Company announced it was expanding its internal investigation and provided disappointing results again. The Company noted that the Audit Committee's investigation was ongoing, and that fourth quarter 2018 and subsequent periods going forward remain open from an accounting perspective and are "subject to adjustment for material updates," and that Symantec did not anticipate a material adverse impact on its financial statements for the third quarter 2018 and earlier periods.

209.    Symantec moreover stated that implied billings fell $110 million shy of the expectations of management and fell by $203 million year-over-year to $996 million.  The Company also announced that its Enterprise Security segment implied billings fell by $203 million year-over-year, to $453 million and Consumer Digital Safety segment implied billings were flat. The billings misses were attributed to issues in pipeline management in North America resulting in longer deal closure rates.  Symantec also announced a plan to cut 8% of its global work force to reduce costs, and issued reduced earnings and revenue guidance for the second quarter and remainder of the fiscal year, specifically stating that it expected revenue in the range of $4.64 billion to $4.76 billion in the fiscal year, and earnings per share of $0.08.

210.    On September 24, 2018, the Company issued a press release announcing the completion of the Audit Committee's investigation and its findings.  The press release stated, in relevant part:

MOUNTAIN VIEW, Calif.--(BUSINESS WIRE)-- Symantec Corp. (NASDAQ:SYMC) today announced that the Audit Committee of the Board of

66

Directors (the "Audit Committee") has concluded its internal investigation, which was originally announced in May 2018. The Audit Committee, assisted by independent legal counsel and a forensic accounting firm, conducted a thorough investigation of the allegations raised by a former employee.

The Company does not anticipate a restatement or adjustment of any audited or unaudited, filed or previously announced, GAAP or non-GAAP financial statements; except as described below with respect to a specific transaction with a customer entered into in the fourth quarter of fiscal year 2018 (ended March 30, 2018).

No employment actions with respect to any Section 16 officer have been recommended as a result of the investigation.

The Audit Committee noted relatively weak and informal processes with respect to some aspects of the review, approval and tracking of transition and transformation expenses. The Audit Committee also observed that beginning in the second quarter of fiscal year 2018 (ended September 29, 2017), the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures.

211.    Concerning specific adjustments, the press release stated:

In addition to the matters announced in May 2018, the Audit Committee reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018 (which is still an open period). After subsequent review of the transaction, the Company has concluded that $12 million of the $13 million should be deferred. Accordingly, the previously announced financial results for the fourth quarter of fiscal year 2018 and the first quarter of fiscal year 2019 (ended June 29, 2018) will be revised to take into account this deferral and any other financial adjustments required as a result of this revision.

212.    The press release also identified actions to be taken by the Company as a result of certain allegations concerning behavior inconsistent with the Company's Code of Conduct, stating, in relevant part:

The Audit Committee also reviewed certain allegations concerning, and identified certain behavior inconsistent with, the Company's Code of Conduct and related

policies. The Audit Committee referred these matters to the Company for, and the Company intends to take, appropriate action.

The Audit Committee proposed certain recommendations which the Board of Directors has adopted, including: appointing a separate Chief Accounting Officer; appointing a separate Chief Compliance Officer reporting to the Audit Committee; clarifying and enhancing the Code of Conduct and related policies; and adopting certain enhanced controls and policies related to the matters investigated.

213.    The press release moreover discussed the filing of the Company's periodic statements going forward, stating, in relevant part:

As previously disclosed, due to the internal investigation the Company has not filed its Annual Report on Form 10-K for the fiscal year ended March 30, 2018 (the "Form 10-K") and Quarterly Report on Form 10-Q for the first fiscal quarter ended June 29, 2018 (the "Q1 Form 10-Q") with the SEC.

The Company is working diligently to complete the preparation of the Form 10-K and the Q1 Form 10-Q and to facilitate the audit of the fiscal year 2018 financial statements and the review of the Q1 quarterly financial statements by its outside auditors. All of the foregoing matters are subject to review and audit by the Company's outside auditors. Control deficiencies or weaknesses could be identified as part of this process. The Company cannot predict at this time when it will make such filings, but is currently targeting filing the Form 10-K prior to October 27, 2018.

214.    The press release also disclosed that "[t]he SEC commenced a formal investigation and the Company will continue to cooperate with the investigation."

215.    On October 26, 2018, the Company filed an annual report on Form 10-K with the SEC, which disclosed that in October 2017, the Compensation Committee adjusted executives' non-GAAP revenue and non-GAAP operating income targets downward from $5.21 billion and $1.85 billion to $5.0 billion and $1.70 billion, respectively.

216.    The Form 10-K also noted that Defendants Clark and Noviello and other executives "elected to forego" equity awards and salary increases for the following fiscal year, stating, in relevant part:

> Subsequent to the announcement of fiscal 2018 performance results, fiscal 2019 guidance, and the Audit Committee Investigation, Symantec's stockholders experienced a substantial decline in the Company's stock price. In this context, Mr. Clark, in consultation with the Compensation Committee, elected to forego a fiscal 2019 equity award. Mr. Clark also determined, in consultation with the Compensation Committee, that none of the Company's [Named Executive Officers] would receive a base salary increase for fiscal 2019.

217.    After the truth about the Individual Defendants' misconduct emerged, there was an exodus of high-level Company executives, including Joe McPhillips, former Director of Channel Sales for the Company's Pacific region, Francis C. Rosch, the Company's former Executive Vice President for Consumer Digital Safety, and Brian Kenyon, former Chief Strategy Officer, each of whom played significant roles in integrating the Blue Coat and/or LifeLock acquisitions.

### Repurchases During the Relevant Period

218.    During the period in which the Company made false and or misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.[11]

219.    According to the Company's financial report for the quarter ended June 30, 2017 filed with the SEC on August 4, 2017 on Form 10-Q, the Company purchased 2.2 million shares of its common stock between April 29, 2017 and May 26, 2017 for an average price of $30.51 and a total purchase price of over $67.1 million.

---

[11] Upon information and belief, some, if not all, of these shares were repurchased subsequent to the beginning of the Relevant Period on May 20, 2017.

220.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $10.99 more than the actual worth of each share between April 29, 2017 and May 26, 2017. Thus, the total over payment by the Company for its repurchases of its own stock between April 29, 2017 and May 26, 2017 was approximately $24.2 million.

## DAMAGES TO SYMANTEC

221.     As a direct and proximate result of the Individual Defendants' conduct, Symantec has lost and expended, and will lose and expend, many millions of dollars.

222.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, CFO, and CAO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

223.     Such expenditures include costs associated with the Audit Committee investigation and the SEC investigation.

224.     Such losses include, but are not limited to, approximately $24.2 million that the Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

225.     Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including incentive awards to certain of the Company's executives resulting from the Compensation Misconduct, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

226.     As a direct and proximate result of the Individual Defendants' conduct, Symantec has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

227.    Plaintiff brings this action derivatively and for the benefit of Symantec to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Symantec, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

228.    Symantec is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

229.    Plaintiff is, and has been at all relevant times, a shareholder of Symantec. Plaintiff will adequately and fairly represent the interests of Symantec in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

230.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

231.    A pre-suit demand on the Board of Symantec is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following thirteen individuals: Individual Defendants Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot (the "Director-Defendants"), and non-parties Peter A. Feld and Dale L. Fuller (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege

demand futility as to seven of the thirteen directors who were on the Board at the time this action was commenced.

232.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while three of them engaged in insider sales based on material non-public information, netting proceeds of over $6.5 million, while, at the same time, they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

233.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the Compensation Misconduct, which they engaged in knowingly or recklessly and unjustly enriched certain of the Individual Defendants, and renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

234.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the conduct alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

235.    Additional reasons that demand on Defendant Clark is futile follow. Defendant Clark has served as CEO and a Company director since August 2016 and is thus, as the Company

admits, a non-independent director. Indeed, he receives handsome compensation, including nearly $6.1 million in the fiscal year ended March 31, 2017. As the Company's CEO, Defendant Clark's compensation would be inflated by the false and misleading statements described herein, demonstrating his motive in facilitating and participating in the fraud. Moreover, Defendant Clark is a defendant in the Securities Class Action. His insider sales before the fraud was exposed, which yielded over $6 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director and CEO Defendant Clark conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Clark was ultimately responsible for all of the misconduct alleged herein, including the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, as he signed each of the periodic filings with the SEC noted above. Indeed, the very purpose of the Individual Defendants' scheme was to increase the financial compensation of Defendant Clark and other executive officers of Symantec. In addition to his interest in his continued employment associated with his compensation package, Defendant Clark and GSC-OZ Investment LLC, an entity controlled by Defendant Clark, entered into an agreement with Symantec on June 12, 2016, pursuant to which the parties agreed to purchase, in the aggregate, 2,329,520 shares of Symantec common stock for an aggregate purchase price of $40,300,696. The agreements provide that, in the aggregate, 207,907 of such shares will vest monthly until October 30, 2019, subject to Mr. Clark's continued service to the Company. Thus, Defendant Clark has a financial stake in continuing to serve Symantec as a result of this agreement, which prevents him from evaluating a demand with disinterest. For these reasons, too, Defendant

Clark breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

236.    Additional reasons that demand on Defendant Hao is futile follow. Defendant Hao has served as a Company director since 2016. He receives handsome compensation, including $340,023 in the fiscal year ended March 31, 2017. As a trusted Company director, Defendant Hao conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016-2017 10-K. Defendant Hao was appointed to the Board in connection with the issuance of $500 million principal amount of 2.5% unsecured notes, due 2021, to investment entities affiliated with Silver Lake, an investment firm where Defendant Hao is a Managing Partner and Managing Director. Silver Lake purchased an additional $500 million aggregate principal amount of 2.0% unsecured notes, due 2021, in June 2016. As a result of these transactions, Defendant Hao and Silver Lake have a vested interest in Symantec's financial health (at least until 2021). As a result of these notes, Defendant Hao is unable to evaluate a demand with independence. Investment firms like Silver Lake compete to fund companies such as Symantec: Silver Lake's website states that its "ideal target company has a leading position in its market, a competitively advantaged business model, a strong management team, proprietary core technologies, sound business processes, and the potential for transformational value creation." Future investment opportunities for Defendant Hao and Silver Lake may be chilled if he were to grant a demand, and thus Defendant Hao is unable to evaluate a demand with independence. Defendant Hao is also a director of Broadcom, Ltd., another

firm accused by the McKenna Article of adding deferred revenue when calculating executive bonuses—the foundation of the Individual Defendants' scheme. Thus, his position as a director of Broadcom, Ltd. may be adversely affected if he were to grant a demand, and he is unable to evaluate a demand with disinterest. For these reasons, too, Defendant Hao breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

237.    Additional reasons that demand on Defendant Humphrey is futile follow. Defendant Humphrey has served as a Company director since 2016. He receives excessive compensation, including $230,332 in the fiscal year ended March 31, 2017. As a trusted Company director Defendant Humphrey conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016-2017 10-K. Defendant Humphrey was appointed to the Board in connection with the purchase of $750 million principal amount of 2.0% unsecured notes, due 2021, to investment entities affiliated with Bain Capital, where Defendant Humphrey is a Managing Director. As a result of that transaction, Defendant Humphrey has a vested interest in Symantec's financial health (at least until 2021) which is material to his primary source of employment. As a result, Defendant Humphrey is unable to evaluate a demand with independence. Further, Defendant Humphrey has a history of placing Bain Capital's needs over those of firms on whose boards he serves: a New York Post article published April 29, 2018 alleges an employee of Viewpoint Construction Software ("Viewpoint") complained to that company's board, specifically including Defendant

Humphrey, in 2016 regarding potentially illegal employment practices, and was fired shortly thereafter. Viewpoint is allegedly the subject of a federal probe regarding potentially illegal firings. Further, Bain Capital is a private equity firm, and such firms compete to fund companies, and future investment opportunities for Defendant Humphrey and Bain Capital may be chilled if he were to grant a demand. For these reasons, too, Defendant Humphrey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

238.    Additional reasons that demand on Defendant Dangeard is futile follow. Defendant Dangeard has served as a Company director since 2007 and is a member of the Audit Committee. He receives handsome compensation, including $360,013 in the fiscal year ended March 31, 2017. As a long-time Company director and member of the Audit Committee, Defendant Dangeard conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016-2017 10-K. Further, Defendant Dangeard has demonstrated an unwillingness to engage with and address wrongdoing at companies on whose board he serves: in May of 2016 Defendant Dangeard asked to be relieved of his duties as deputy chairman of Telenor following a dispute with the Norwegian government over Telenor's handling of an investigation into a Telenor affiliate's dealings in Uzbekistan. For these reasons, too, Defendant Dangeard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

239.    Additional reasons that demand on Defendant Vautrinot is futile follow. Defendant Vautrinot has served as a Company director since 2013 and serves on the Audit Committee. Indeed, she receives handsome compensation, including $345,023 in the fiscal year ended March 31, 2017.  Her insider sales before the fraud was exposed, which yielded over $264,030 in proceeds, demonstrate her motive in facilitating and participating in the fraud. As a trusted Company director and member of the Audit Committee, Defendant Vautrinot conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded her duties to monitor engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she was the maker of many of the false statements and omissions of material fact that are alleged herein, as she signed the 2016-2017 10-K. For these reasons, too, Defendant Vautrinot breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

240.    Additional reasons that demand on Defendant Sands is futile follow. Defendant Sands has served as a Company director since 2013 and serves on the Audit Committee. Indeed, she receives handsome compensation, including $345,013 in the fiscal year ended March 31, 2017. Her insider sales before the fraud was exposed, which yielded over $247,814 in proceeds, demonstrate her motive in facilitating and participating in the fraud. As a trusted Company director and member of the Audit Committee, Defendant Sands conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded her duties to monitor engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she was the maker of many of the false statements and omissions of material

fact that are alleged herein, as she signed the 2016-2017 10-K. For these reasons, too, Defendant Sands breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

241.    Additional reasons that demand on Defendant Schulman is futile follow. Defendant Schulman has served as a Company director since 2000, is Chairman of the Board, and serves on the Compensation Committee. He receives handsome compensation, including $455,013 in the fiscal year ended March 31, 2017. As the Company's Chairman and long-time Company director, he conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016-2017 10-K. For these reasons, too, Defendant Schulman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

242.    Additional reasons that demand on Defendant Mahoney is futile follow. Defendant Mahoney has served as a Company director since 2003 and is Chair of the Compensation Committee. He receives handsome compensation, including $370,023 in the fiscal year ended March 31, 2017.  As a long-time Company director and Chair of the Compensation Committee, Defendant Mahoney conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the

maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016-2017 10-K. For these reasons, too, Defendant Mahoney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

243.    Additional reasons that demand on Defendant Unruh is futile follow. Defendant Unruh has served as a Company director since 2005 and is Chair of the Audit Committee. He receives handsome compensation, including $370,013 in the fiscal year ended March 31, 2017. As a long-time Company director, and Chair of the Audit Committee, Defendant Unruh conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016-2017 10-K. For these reasons, too, Defendant Unruh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

244.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since 1994 and serves on the Audit and Compensation Committees. He receives handsome compensation, including $380,013 in the fiscal year ended March 31, 2017. As a long-time Company director and member of the Audit and Compensation Committees, Defendant Miller conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the

scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016-2017 10-K. For these reasons, too, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

245.   Additional reasons that demand on Defendant Laybourne is futile follow. Defendant Laybourne has served as a Company director since 2008 and serves on the Compensation Committee. Indeed, she receives handsome compensation, including $340,012 in the fiscal year ended March 31, 2017. As a long-time Company director and member of the Compensation Committee, Defendant Laybourne conducted little, if any, oversight of the Company's engagement in the Compensation Misconduct and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded her duties to monitor engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Laybourne breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

246.   Additional reasons that demand on the Board is futile follow.

247.   As described above, three of the Directors on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct and, in the case of Defendant Clark, in violation of the Code of Ethics. Defendants Clark, Sands and Vautrinot received proceeds of over $6.5 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

248.    Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action, and one of whom is a defendant in the Securities Class Action, control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

249.    Defendants Clark, Noviello, and Humphrey all served together at Blue Coat prior to its acquisition by Symantec in August of 2016. This social and professional connection, combined with the substantial likelihood of liability that Defendants Clark and Noviello face in the Securities Class Action, prevents Defendant Clark from evaluating a demand with disinterestedness or independence and prevents and Defendant Humphrey from evaluating a demand with independence. Thus, demand upon Defendants Clark and Humphrey is futile, and therefore, excused.

250.    Defendant Clark has consistently represented to the media that Defendant Schulman has provided him with mentorship and guidance since Defendant Clark assumed the role of CEO of Symantec. Such statements evidence a close personal relationship between the two men. Given this close personal relationship and the substantial likelihood of liability that Defendant Clark faces in the Securities Class Action, Defendant Schulman is unable to evaluate a demand with independence, and thus, demand is excused as to Defendant Schulman.

251.    Defendants Dangeard, Laybourne, Mahoney, Miller, Schulman, and Unruh are all long-time Company directors, having served on the Board together for the last 10 years or more.

81

Thus, upon information and belief, these directors have developed personal connections which prevent them from evaluating a demand with independence.

252.   Additionally, each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by nearly $24.2 million for its own common stock during the period in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company, and yet they approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

253.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the scheme to make, and to fail to correct, materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

254.   In violation of the Code of Ethics, Defendant Clark conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets,

unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. Defendant Clark violated the Code of Ethics by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Ethics, Defendant Clark failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

255.    Symantec has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Director-Defendants or others who were responsible for that wrongful conduct to attempt to recover for Symantec any part of the damages Symantec suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

256.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

257.    The acts complained of herein constitute violations of fiduciary duties owed by Symantec's officers and directors, and these acts are incapable of ratification.

258.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Symantec. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Directors or certain of the officers of Symantec, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

259.    If there is no directors' and officers' liability insurance, then the Directors will not cause Symantec to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

260.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

261.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

262.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not

sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

263.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

264.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

265.    Under the direction and watch of the Individual Defendants, the 2017 Proxy Statement failed to disclose that: (1) the Company improperly recognized revenue in violation of GAAP and SEC regulations, including by accelerating the recognition of deferred revenue that had not met GAAP revenue recognition criteria, and thus overstated its adjusted revenue and adjusted operating income; (2) the Company was not in compliance with its own policy on internal revenue recognition; (3) the Company utilized a "Restructuring, separation, transition and other" adjustment to entirely remove Symantec's "transition costs" from its adjusted operating expenses, despite that this line item consisted of recurring and continuing operating expenses incurred in the

ordinary course of business, and thus this line item and the Company's transition costs were misstated; (4) the Company's operating margin, earnings per share, and adjusted operating income figures, which were derived using the above misleading metrics, were also misstated; (5) as a result of the Company's use of certain non-GAAP measures, the Company would be subject to an investigation by the SEC; (6) the Company retaliated against employees; (7) the Compensation Misconduct was occurring; (8) the Company was manipulating financial metrics to falsely indicate that the Company and its strongly-promoted Blue Coat and LifeLock acquisitions were successful; and (9) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

266.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay for performance" elements while failing to disclose that the Company's non-GAAP financial measures were being artificially inflated by the Individual Defendants' scheme, and therefore any compensation based on the Company's financial performance was artificially inflated.

267.    The 2017 Proxy Statement also made reference to the Company's Code of Conduct and Code of Ethics. The Code of Conduct required the Company and Individual Defendants to abide by relevant laws and statutes, make accurate and non-misleading public disclosures, deal fairly with the public, not engage in insider trading, and not retaliate against employees. By issuing false and misleading statements to the investing public, engaging in insider trading, and permitting retaliation against employees, the Individual Defendants violated the Code of Conduct and Defendants Clark and Noviello violated the Code of Ethics. The 2017 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Conduct and Code of Ethics were being violated.

268.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

269.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

270.    Plaintiff, on behalf of Symantec, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 10(b)
### and Rule 10b-5 of the Exchange Act

271.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

272.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Symantec. Not only is Symantec now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Symantec by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of dollars of its own shares at artificially-inflated prices, damaging Symantec.

273.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify

the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

274.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Symantec not misleading.

275.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Symantec. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

276.   In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, each made and/or signed the Company's Form 10-K and/or Form 10-Qs filed with the SEC during the Relevant Period.

277.	By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

278.	Plaintiff, on behalf of Symantec, has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

279.	Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

280.	The Individual Defendants, by virtue of their positions with Symantec and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Symantec and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20 (a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Symantec to engage in the illegal conduct and practices complained of herein.

281.	Plaintiff, on behalf of Symantec, has no adequate remedy at law.

### FOURTH CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

282.	Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

283.	Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Symantec's business and affairs.

284.	Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

285.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Symantec.

286.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

287.     In further breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Compensation Misconduct.

288.     Also in breach of their fiduciary duties owed to Symantec, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company improperly recognized revenue in violation of GAAP and SEC regulations, including by accelerating the recognition of deferred revenue that had not met GAAP revenue recognition criteria, and thus overstated its adjusted revenue and adjusted operating income; (2) the Company was not in compliance with its own policy on internal revenue recognition; (3) the Company utilized a "Restructuring, separation, transition and other" adjustment to entirely remove Symantec's "transition costs" from its adjusted operating expenses, despite that this line item consisted of recurring and continuing operating expenses incurred in the ordinary course of business, and thus this line item and the Company's transition costs were misstated; (4) the Company's operating margin, earnings per share, and adjusted operating income figures, which were derived using the above misleading metrics, were also misstated; (5) as a result of the Company's use of certain non-GAAP measures, the Company would be subject to an investigation by the SEC; (6) the Company retaliated against employees; (7) the Compensation Misconduct was occurring; (8) the Company

was manipulating financial metrics to falsely indicate that the Company and its strongly-promoted Blue Coat and LifeLock acquisitions were successful; and (9) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

289.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

290.   In breach of their fiduciary duties, four of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing over $67.1 million worth of Company stock at artificially inflated prices.

291.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Symantec's securities and disguising insider sales.

292.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and, *inter alia*, for the purpose and effect of artificially inflating the price of Symantec's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

293.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

294.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Symantec has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

295.   Plaintiff, on behalf of Symantec, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

296.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

297.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Symantec.

298.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Symantec that was tied to the performance or artificially inflated valuation of Symantec, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

299.    Plaintiff, as a shareholder and a representative of Symantec, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

300.    Plaintiff, on behalf of Symantec, has no adequate remedy at law.

### SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

301.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

302.    As a result of the foregoing, the Company made excessive incentive payments to executive officers based on non-GAAP financial metrics which were artificially inflated by the Individual Defendants' scheme.

303.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

304.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

305.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

306.    Plaintiff, on behalf of Symantec, has no adequate remedy at law.

## PRAYER FOR RELIEF

307.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Symantec, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Symantec;

(c)    Determining and awarding to Symantec the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Symantec and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Symantec and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Symantec to nominate at least seven candidates for election to the board; and

94

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Symantec restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: November 21, 2018

Of Counsel:

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*